Frank J. Colucci  (FC-8441)
   *Admitted Pro Hac Vice*
Richard P. Jacobson (RJ-2843)
   *Admitted Pro Hac Vice*
COLUCCI & UMANS
218 East 50th Street
New York, New York 10022
FColucci@Colucci-Umans.com
RJacobson@Colucci-Umans.com
Telephone:   212.935.5700
Facsimile:   212.935.5728

Timothy J. Franks (#013532)
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788
TFranks@PerkinsCoie.com
Telephone:   602.351.8000
Facsimile:   602.648.7000

Attorneys for Defendant/Counterclaimant
Q.R.T.M., S.A. de C.V.

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

La Quinta Worldwide, LLC,

                Plaintiff,

     v.

Q.R.T.M., S.A. de C.V.,

                Defendant.

No. CIV-09-00175-TUC-RCC

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**Oral Argument Requested**

1

## TABLE OF CONTENTS

2
Preliminary Statement ..............................................................................i

3
Introduction ..............................................................................................iii

4
Statement of Additional Relevant Facts .............................................1

5
ARGUMENT .............................................................................................1

6
I.      SUMMARY JUDGMENT IS APPROPRIATE
7       WHERE, AS HERE, THE ONLY EVIDENCE OF
        CONFUSION IS A SURVEY THAT IS FRAUGHT
8       WITH METHODOLOGICAL ERRORS .......................................2

9       A.  With Conflicting Surveys Reaching Different Results,
            Summary Judgment Must be Denied to Plaintiff ...................4

10      B.  Objection to Plaintiff's Expert Report ...................................4

11          1.  Use of a Card With the words QUINTA REAL
                as the Survey Stimulus Improperly Fails to
12              Reflect the Context of the Mark ..................................

13          2.  The Johnson Survey's Underinclusive Universe
                Renders it Objectionable ..............................................7
14
15          3.  The "Spontaneous" Comments Included in Johnson's
                Survey Overstate and Mislead the Results ................8

16          3.  Inappropriate Coding Also Overstated the Results ....9

17      C.  Plaintiff Cannot Establish Likelihood of Confusion .............

18          1.  Strength of Mark ...........................................................7

19          2.  Relatedness of the Services ..........................................8

20          3.  Similarity of the Marks .................................................9

21          4.  In More than Twenty Years of Use,
                No Actual Confusion Has Occurred ............................10
22
23          5.  The Marketing Channels Used By the Parties
                Do Not Overlap to Any Significant Degree ...............11

24          6.  Degree of Consumer Care ...........................................12

25          7.  Defendant's Intent ........................................................12

26          8.  Likelihood of Expansion ..............................................13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**II.      PLAINTIFF CANNOT PREVAIL ON ITS DILUTION CLAIM** .................13

**III.     PLAINTIFF'S "USE IN COMMERCE" ARGUMENT
IS INCONSEQUENTIAL AND INAPPLICABLE** ...............................16

**CONCLUSION** ...........................................................................17

1

## TABLE OF AUTHORITIES

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC,*
  447 F. Supp. 2d 266 (S.D.N.Y. 2006)............................................11

*AMF Inc. v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir. 1979)......................................................12

*Amstar Corp. v. Domino's Pizza, Inc.,*
  615 F.2d 252 (5th Cir. 1980).....................................................11

*Beneficial Corp. v. Beneficial Capital Corp.,*
  529 F. Supp. 445 (S.D.N.Y. 1982)............................................8, 9

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.,*
  174 F.3d 1036 (9th Cir. 1999)................................................13, 16

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)....................................................................5

*Chance v. Pac-Tel Teletrac Inc.,*
  242 F.3d 1151 (9th Cir. 2001)...............................................16, 17

*ComponentOne, L.L.C. v. Componentart, Inc.,*
  No. 02:05cv1122,
  2008 U.S. Dist. LEXIS 87066 (W.D. Pa. Oct. 27, 2008)................9, 10

*Conversive, Inc. v. Conversagent, Inc.,*
  433 F. Supp. 2d 1079 (C.D. Cal. 2006).........................................6

*Dreamwerks Prod. Group, Inc. v. SKG Studio,*
  142 F.3d 1127 (9th Cir. 1998)...................................................12

*E. & J. Gallo Winery v. Consorzio del Gallo Nero,*
  782 F. Supp. 457 (N.D. Cal. 1991)..............................................6

*Entrepreneur Media, Inc. v. Smith,*
  279 F.3d 1135 (9th Cir. 2002)...............................................12, 14

*First Nat'l Bank in Sioux Falls v. First Nat'l Bank So. Dakota SPC, Inc.,*
  655 F. Supp. 2d 979 (D.S.D. 2009)..............................................9

*Franklin Resources, Inc. v. Franklin Credit Management Corp.,*
  988 F. Supp. 322 (S.D.N.Y. 1997)..............................................8

*Grupo Gigante SA de CV v. Dallo & Co., Inc.,*
  391 F.3d 1088 (9th Cir. 2004)....................................................17

*Frehling Enters., Inc. v. Int'l Select Group, Inc.,*
  192 F.3d 1330 (11th Cir. 1999)..................................................15

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

*In re Casino de Monaco Trademark Litigation*,
  No. 07 Civ. 4802 (DAB),
  2010 U.S. Dist. LEXIS 33950 (S.D.N.Y. Mar. 31, 2010)............................17

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  No. 04 CIV. 7203 (DLC),
  2006 U.S. Dist. LEXIS 20787 (S.D.N.Y. Apr. 19, 2006)............................8

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*,
  856 F.2d 1445 (9th Cir. 1988)..................................................12

*Moose Creek, Inc. v. Abercrombie & Fitch Co.*,
  331 F. Supp. 2d 1214 (C.D. Cal. 2004)..........................................13

*Murray v. Cable Nat'l Broad. Co.*,
  86 F.3d 858 (9th Cir. 1996)......................................................5

*New West Corp. v. NYM Co. of California, Inc.*,
  595 F.2d 1194 (9th Cir. 1979)...................................................16

*Nike, Inc. v. Nikepal Int'l, Inc.*,
  84 U.S.P.Q.2d 1521 (E.D. Cal. 2007)............................................15

*Official Airline Guides, Inc. v. Goss*,
  6 F.3d 1385 (9th Cir. 1993)......................................................13

*Pepsico, Inc. v. #1 Wholesale, LLC*,
  84 U.S.P.Q.2d 1040 (N.D. Ga. 2007)............................................15

*R&R Partners, Inc. v. Tovar*,
  447 F. Supp. 2d 1141 (D. Nev. 2006)............................................5, 6

*Rodeo Collection, Ltd. v. West Seventh*,
  812 F.2d 1215 (9th Cir. 1987)...................................................12

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009) .......................................................15

*Surfvivor Media, Inc. v. Survivor Prods.*,
  406 F.3d 625 (9th Cir. 2005).....................................................12

*Tokidoki, LLC v. Fortune Dynamic, Inc.*,
  No. CV 07-1923 DSF (PJWx),
  2009 U.S. Dist. LEXIS 65665 (C.D. Cal. July 28, 2009)............................9

*Trouble v. Wet Seal, Inc.*,
  179 F. Supp. 2d 291 (S.D.N.Y. 2001)..............................................9

1

*We Media Inc. v. General Electric Co.*,
   218 F. Supp. 2d 463 (S.D.N.Y. 2002)................................................................9

2

*YKK Corp. v. Jungwoo Zipper Co., Ltd.*,
   213 F. Supp. 2d 1195 (C.D. Cal. 2002)...........................................................5

3

4

5

## STATUTES, REGULATIONS AND RULES

6

Fed. R. Civ. P. 56(c)(2)...............................................................................5

7

15 U.S.C. § 1125(a)....................................................................................2

8

15 U.S.C. § 1125(c)....................................................................................2

9

10

## BOOKS

11

4 J.Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition*,
   § 23:41 (4th ed. 2009)...........................................................................13

12

13

Shari Seidman Diamond, *Reference Guide on Survey Research,* in *Reference
   Manual on Scientific Evidence*
   (Federal Judicial Center, 2d ed. 2000).....................................................10

14

15

16

17

18

19

20

21

22

23

24

25

26

**Preliminary Statement**

Defendant, Q.R.T.M., S.A. de C.V. ("defendant" or "Quinta Real"), opposes the motion for summary judgment by plaintiff, La Quinta Worldwide, LLC ("plaintiff" or "La Quinta"). In addition to the accompanying Response in Opposition to Plaintiff's Statement of Undisputed Material Facts, Objection to Plaintiff's Expert Report, and Additional Facts that Establish Genuine Issues of Material Fact ("Resp." and "Add'tl Facts"), Quinta Real relies upon the documents filed with its motion for summary judgment [Docket #66], specifically, the Statement of Undisputed Material Facts ("Stmt."), Declarations of Francisco Martinez Hermosillo (Quinta Real's vice president), José Antonio Alonso Espinosa (Chairman of Quinta Real), Dr. Michael Mazis (Professor Emeritus of Marketing at The American University in Washington, D.C.), and Frank J. Colucci (counsel for Quinta Real) and the additional declarations of Mr. Hermosillo, Mr. Espinosa, and Mr. Colucci filed herewith in opposition to plaintiff's motion.

**Introduction**

There is no likelihood of confusion because Plaintiff and Quinta Real operate in completely different marketplaces. Though both offer hotel services in the broadest sense, plaintiff's LA QUINTA chain of motels and hotels that are located adjacent to airports and highways cannot be compared to the award-winning Quinta Real hotels that feature gourmet restaurants with upscale regional Mexican cuisine, twenty-four-hour room service, and concierge services in offering luxurious accommodations, which plaintiff's motels and hotels lack. The survey offered by plaintiff's expert, Philip Johnson, is fraught with such methodological errors that the entire survey is of no value. After accounting for and rectifying the procedural defects with plaintiff's purported survey, Quinta Real's survey expert, Dr. Michael Mazis, designed a study that proved there is no actionable level of confusion.

Plaintiff's dilution claim cannot succeed because the LA QUINTA mark, while it

1   may be fairly recognizable, does not fall within that small, select group of marks that are

2   truly famous, as that term is defined in the Trademark Dilution Revision Act, 15 U.S.C. §

3   1125(c).

4       By dwelling on its argument that the QUINTA REAL mark has not been "used in

5   commerce" in the United States, La Quinta ignores the undisputed fact that Quinta Real

6   has actively marketed and transacted business with American consumers in the United

7   States and coexisted with plaintiff for more than twenty-four years without any actual

8   confusion arising.  (Stmt. ¶ 8.)  Since this case is no longer before the Trademark Trial

9   and Appeal Board ("TTAB"), whether Quinta Real's longtime use of its mark constitutes

10  "use in commerce" under the Lanham Act is of no consequence.  Rather, the essential

11  inquiry must consider whether Quinta Real's use is likely to cause confusion with plaintiff

12  and its mark.  Since plaintiff has taken the opposite stance by opening LA QUINTA hotels

13  in Mexico where Quinta Real has unquestioned rights (Stmt. ¶ 61), its position is curious,

14  at a minimum, and inconsistent with its approach in this litigation.

15      Moreover, plaintiff also has co-existed (indeed, was preceded by) the well-known

16  La Quinta Resort and Club ("La Quinta Resort") that has been in operation since 1926.

17  (Stmt. ¶ 57.)

18      The QUINTA REAL brand is immensely important to defendant.  It signifies to a

19  certain type of traveler a high standard of service and luxury, much like Ritz-Carlton and

20  Four Seasons.  (Stmt. ¶ 63.)  While it is possible that Quinta Real could operate under a

21  different name in the United States, fortunately, the law does not compel that result.  The

22  law only requires that the use of the mark not be "likely to cause confusion, or to cause

23  mistake, or to deceive as the affiliation, connection, or association … with another…, or

24  as to the origin, sponsorship, or approval of his or her goods, services or commercial

25  activities by another person."  15 U.S.C. § 1125(a)(1)(A) (2008).

26      Quinta Real carefully guards the stewardship of its mark.  With only nine

-2-

1   properties, it does not wish to become as large as plaintiff.  By intentionally remaining

2   small, Quinta Real has managed careful growth as it simultaneously adheres to its

3   incomparable standards.

4        Since a visit to a luxury resort like Quinta Real is not an "impulse" purchase,

5   consumers will make a reservation to such a destination resort only after much research

6   and consideration.  Reasonably prudent consumers could not possibly mistake Quinta

7   Real's unique, luxury resort properties for the standardized look and feel of plaintiff's La

8   Quinta hotels.   When consumers encounter Quinta Real's properties – in guidebooks,

9   brochures or the internet – it is immediately apparent the hotel brands are entirely distinct.

10  (*Compare* Hermisillo Decl., Exs. 6-8, *with* Trivedi Decl., Ex. 19.)

11       Consequentially, the record before the Court precludes summary judgment in

12  favor of plaintiff.  On the contrary, the Court should grant summary judgment to

13  defendant and dismiss plaintiff's claims.

14                   **<u>Statement of Additional Relevant Facts</u>**

15       Despite years of favorable publicity about the Quinta Real hotels and awards

16  (Stmt. ¶ 26-31), including its selection as the only hotel chain in Mexico for which all of

17  its properties in Mexico received the Four Diamond Award from the American

18  Automobile Association ("AAA") (Stmt. ¶ 11), the only negative evidence plaintiff offers

19  is the disappointment claimed by plaintiff's corporate representative with his purported

20  brief stay at one property.

21       The views of Mr. Trivedi regarding his visit, however, must be viewed through the

22  prism that reflects his inherent bias.  If plaintiff truly has such a jaundiced opinion of

23  Quinta Real's standards, query why its Director for Franchise Development in Mexico,

24  Monica Artigas, recently contacted the chairman of Quinta Real to propose establishing a

25  relationship with Quinta Real to help develop franchises for the La Quinta brand in

26  Mexico.  (Add'tl Facts ¶ 10.)

Likewise, Mr. Trivedi's biases emerge in his inflated opinion of the quality of LA QUINTA motels and hotels.  Plaintiff claims to have a high level of guest satisfaction, yet it never produced any such documentation.  Meanwhile, J.D. Power & Associates, the independent consumer research organization, conducts an annual survey of hotel guest satisfaction for the industry, and La Quinta consistently ranks well *below* the average rating for its competitive set, which is the mid-scale limited service segment and includes other chains such as Hampton Inn, Holiday Inn Express, Comfort Inn, AmeriSuites, Fairfield Inn, Sleep Inn and several others of that ilk.  (Add'tl Facts ¶ 9.)

Furthermore, plaintiff's guests have posted excoriating reviews on the widely-read travel website hotels.com.  Many of the comments paint a decidedly different picture than Mr. Trivedi's perspective from plaintiff's corporate suite, including comments from guests at La Quinta's Tucson and Phoenix properties, who remarked:

- May 8, 2010: "*Poor Service and Very Dirty* . . . We checked into our room and right away we noticed the odor of smoke, and an ashtray on the desk (reservations were for a non-smoking room). . . ."  (Add'tl Facts ¶ 2a)

- February 18, 2010: "*Most disgusting ever!!!*"  (Add'tl Facts ¶ 2a)

- August 5, 2009:  "*Don't stay here!*  This place is the pits.  My room had a dirt stained tub with a slow drain, so by the time I finished showering I stood knee deep in dirty bath water. . . ."  (Add'tl Facts ¶ 2a)

- April  6, 2010: "*Grounds are horrible; funky motel at best.* . . . Not worth the $$ (or any $$ for that matter).  Didn't feel totally safe in parking lot.  Trash everywhere.  Hallways dark. . . ."  (Add'tl Facts ¶ 2b)

- September 18, 2006:  "*Never again.*"  (Add'tl Facts ¶ 2b)

- June  27,  2009: "*LQ stands for Leave Quickly.* . . . I think someone in a previous post mentioned skid row.  This, in my opinion fits that description. . . ."  (Add'tl Facts ¶ 2c)

- June 27, 2006:  "*Don't stay at this hotel!* . . . [T]his hotel should be stripped of it's [sic] La Quinta brand because of the condition of the property and the experience of staying there.  It was more like an S. R.O. on Skid Row than anything else. . . ."

1    (Add'tl Facts ¶ 2c)

2

3                            **ARGUMENT**

   I.    **SUMMARY JUDGMENT IS APPROPRIATE WHERE, AS HERE, THE**
4        **ONLY EVIDENCE OF CONFUSION IS A SURVEY THAT IS FRAUGHT**
         **WITH METHODOLOGICAL ERRORS**
5
         Where the record consists of expert reports from each party with diametrically
6
   opposed results, summary judgment ordinarily would be denied because the conflicting
7
   evidence creates disputed issues of fact.  *See Fed. R. Civ. P.* 56(c)(2).  In the present
8
   matter, however, the survey and report by plaintiff's expert is utterly defective because it
9
   fails to follow proper methodology and should be excluded.
10
         A.    **With Conflicting Surveys Reaching Different Results,**
11              **Summary Judgment Must be Denied to Plaintiff**

12       Plaintiff bears the burden of pointing out to the Court the basis for the motion and

13   the elements of the causes of action upon which it contends Quinta Real will be unable to

14   establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

15   (1986).  Not only has plaintiff failed to meet its burden, the paucity of evidence

16   underlying its case subjects plaintiff to summary judgment in favor of Quinta Real.

17       Plaintiff cites *YKK Corp. v. Jungwoo Zipper Co., Ltd.*, 213 F. Supp. 2d 1195 (C.D.

18   Cal. 2002), for the proposition that summary judgment can be granted even in the face of

19   "competing expert surveys."  (Pl. Mem. at 9.)  However, in *Jungwoo Zipper* there was no

20   "competing expert survey," as plaintiff claims.  Rather, the plaintiff's expert merely

21   criticized the defendant's survey.  *Id.* at 1204 n.2.  *Murray v. Cable Nat'l Broad. Co.*, 86

22   F.3d 858 (9th Cir. 1996), also did not involve "competing surveys."  *Id.* at 860-61.

23       Plaintiff's reliance on *R&R Partners, Inc. v. Tovar*, 447 F. Supp. 2d 1141 (D. Nev.

24   2006), also is misplaced.  The court held there was a likelihood of confusion between the

25   plaintiff's service mark "What Happens Here Stays Here," for tourism services promoting

26   Las Vegas, and the defendant's "What Happens in Vegas Stays in Vegas," for clothing.

1    *Id.* at 1157.  In that case, however, the plaintiff produced evidence of actual confusion in

2    the form of both declarations from confused individuals and survey evidence indicating

3    that one-third of respondents believed that the defendant's shirts were authorized or

4    sponsored by the plaintiff, with no countervailing survey or expert report from the

5    defendant.  *Id.* at 1153-55, 1157.  Similarly, *Conversive, Inc. v. Conversagent, Inc.*, 433 F.

6    Supp. 2d 1079 (C.D. Cal. 2006), is inapposite because the plaintiff also was able show

7    actual confusion among its customers.  *Id.* at 1087.  In the instant case, of course, no such

8    instances have occurred despite more than twenty years of co-existence.

9       Although there were competing surveys at issue in *E. & J. Gallo Winery v.*

10   *Consorzio del Gallo Nero*, 782 F. Supp. 457 (N.D. Cal. 1991), the defendant's survey

11   compared the products side-by-side, which the court observed was a format often deemed

12   "legally irrelevant" to the issue of likelihood of confusion.  *Id.* at 466 (citing cases).

13      **B.      Objection to Plaintiff's Expert Report**

14      The survey that La Quinta commissioned by Philip Johnson[1] is fatally flawed for

15   myriad reasons, and in accordance with LRCiv 7.2, Quinta Real objects to the admission

16   of Johnson's reports, survey, declaration and testimony.

17      The Johnson study is seriously flawed for several reasons, including the failure to

18   properly define the survey universe and the failure to simulate marketplace conditions:

19       • Rather than exposing the survey respondents to actual promotional
20         materials, Johnson's survey design involved merely handing each
         participant a card printed with the words QUINTA REAL.  The card offered
21        no information about the nature or quality of the Quinta Real hotels.  Thus,
         it failed to reflect in any manner the actual marketplace.  In contrast, the
22       survey by Dr. Mazis exposed survey respondents to promotional materials

23

24       [1] La Quinta attached to its complaint the report from a survey conducted by Philip
     Johnson ("*Johnson I*").  Although La Quinta produced an expanded report by Mr. Johnson
25   in December 2009 ("*Johnson II*"), the underlying data remained the same.  Thus, in the
     nine-month period between La Quinta's filing of the lawsuit and the deadline to produce
26   its expert report, it did not expand or modify its survey beyond the Arizona state limits.
     (Objections ¶ 9.)

actually used by Quinta Real on its website.  The Quinta Real website enables consumers to learn about the resort and book reservations.

- Johnson's study also is flawed because it was conducted only within two metropolitan areas in Arizona, and did not capture a representative sampling of the relevant population.

- Furthermore, Mr. Johnson artificially inflated his results by including an inappropriate question and improperly coding certain responses.

- Finally, Johnson failed to use a proper control.  COSTA REAL was a weak control and unlikely to satisfactorily fulfill its function of controlling for "noise" or guessing.

(*See* Mazis Decl., ¶¶ 12-18.)

Dr. Mazis reviewed the Johnson survey and conducted his own survey, except he accounted for and corrected the inherent defects in the methodology and execution of the Johnson survey.  By taking into account and correcting the major flaws in Johnson's report, Dr. Mazis obtained a more accurate and representative snapshot of consumer perception of the QUINTA REAL marks.  Unlike Mr. Johnson's survey, Dr. Mazis conducted his survey in sixteen cities across the United States.  The survey conducted by Dr. Mazis reflected that only an insignificant number of respondents (5.3%) believed that QUINTA REAL is somehow associated with LA QUINTA.  (Stmt. ¶¶ 9-10.)  Consequently, there is little or no likelihood of confusion as to source or affiliation for the name QUINTA REAL.

### 1.   Use of a Card With the Words QUINTA REAL as the Survey Stimulus Fails to Reflect the Context of the Mark

If the objective were to focus only on the names, without due consideration to the overall marketplace context, then certainly using a card suits the bill.  However, such an approach is not proper in federal court litigation because it fails to show the manner of how the services are offered.  Furthermore, Mr. Johnson is well aware of this dictate because his surveys have been criticized for this very reason in other cases:

1
2
3
4
5
6

The failure to replicate marketplace conditions is particularly troubling since Johnson has designed over 300 likelihood of confusion surveys, and this is the only such survey conducted with face-to-face interviews in which he did not show the product to the respondents, either through a picture or display. Essentially, the survey was a word association test, in which respondents were shown a card with the word Juicy and repeatedly asked questions in which the word Juicy appeared, often not just once but twice in the same question. See *Playtex*, 390 F.3d at 168 (rejecting index card survey that failed to display products as they are "presented and packaged").

7   *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 CIV. 7203 (DLC), 2006 U.S. Dist.

8   LEXIS 20787 at *78-79 (S.D.N.Y. Apr. 19, 2006).

9   If the only conclusion from the survey is that the names are similar, then the survey

10  is of no value whatsoever.  This is not the first time Mr. Johnson has faced such criticism.

11  In *Franklin Resources, Inc. v. Franklin Credit Management Corp.*, 988 F. Supp. 322

12  (S.D.N.Y. 1997), the court determined that Johnson's surveys on behalf of the plaintiff

13  only minimally took into account actual market conditions.  Although the surveys

14  produced some evidence of confusion, the court determined this was of "slight probative

15  value" and dismissed the plaintiff's complaint.  *Id.* at 336.  The court's reasoning is

16  instructive and, with respect to Mr. Johnson's deliberate choice to utilize a card as the

17  stimulus for a hotel study, enlightening:

18
19

Surveys which do nothing more than demonstrate the respondents' ability to read are not probative on the issue of likelihood of consumer confusion.

20  *Id.* at 335.  In describing this approach, the court concluded:

21
22
23
24
25

The survey establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assumption that, in the absence of any other information, two companies with similar names are likely to have a business connection. However, this proposition provides no indication of public reaction under actual market conditions, and we conclude that there is no meaningful evidence of actual confusion.

26  *Id.* at 336 (quoting *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F. Supp. 445, 451

1    (S.D.N.Y. 1982)).

2          Quite simply, the courts disfavor and criticize card surveys, such as Johnson's.

3    See *Tokidoki, LLC v. Fortune Dynamic, Inc.*, No. CV 07-1923 DSF (PJWx), 2009 U.S.

4    Dist. LEXIS 65665, at *21 (C.D. Cal. July 28, 2009) (plaintiff's survey failed to expose

5    respondents to products as they are in the real world; hence, it was leading and unrealistic

6    – an "artificial matching game"); *First Nat'l Bank in Sioux Falls v. First Nat'l Bank So.*

7    *Dakota SPC, Inc.*, 655 F. Supp. 2d 979, 1000 (D.S.D. 2009) (survey employing bank

8    advertisements more closely resembled market conditions at issue than other party's

9    survey methodology that involved displaying a series of cards); *We Media Inc. v. General*

10   *Electric Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) (criticizing methodology of

11   plaintiff's survey report as merely consisting of word associations devoid of context,

12   rather than pictures or advertisements that reflected what potential consumers of television

13   would encounter); *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001)

14   (excluding survey in part because stimuli comprised use of cards with mark printed on

15   them); *see also ComponentOne, L.L.C. v. Componentart, Inc.*, No. 02:05cv1122, 2008

16   U.S. Dist. LEXIS 87066, at *79-81 (W.D. Pa. Oct. 27, 2008) at *79-81 ("Instead of using

17   screen shots of the parties' websites . . . [the survey expert] presented the parties' marks

18   on a plain background in large block letters," and the Court found such stimuli to be

19   "completely divergent from the conditions that potential purchasers encounter in the

20   parties' marketplace" by essentially conducting a word association test devoid of context.)

21

22         Plaintiff tries to undermine the use of the Quinta Real website in the Mazis study

23   by contending a relatively small percentage of guests book their reservations directly

24   through the website.  The argument misses the point, however, because this approach

25   reflects the experience of at least some *actual* consumers, as opposed to simply showing a

26   respondent a card with the name only, devoid of any context.  Even when one reviews a

     travel guide book for information, it contains more than just the name of the property.

1   First, travel books generally organize hotel listings in a manner that reflects their relative

2   cost.  (Add'tl Facts ¶ 11)  Second, even the thickest travel books only provide a few lines

3   of text and perhaps one small picture of the property.  The website, on the other hand,

4   offers a dynamic experience with multiple pictures and details on the property, activities,

5   accommodations, and rates.  Third, the quintareal.com website serves as the single

6   common denominator.  In other words, the travel guide books typically identify the

7   hotel's website to its readers as do third-party travel websites and the brochures of the

8   high-end travel agents with whom Quinta Real has partnered.  (*Id.*)  Thus, according to

9   plaintiff's expert, because no one single source serves all guests that seek information

10  about the Quinta Real hotels, the better approach was to simply utilize a card with just the

11  name.

12          Mr. Johnson tries to justify his approach as stating that consumers perceive the

13  mark "in a guide book, directory, phone book, on a road sign, on a billboard, on a web

14  search pages, or a map, or other media and advertising, as well as replicating when a

15  consumer receives a verbal description and/or recommendation that features the hotel

16  name with minimal additional information."  (Pl. SOF, Ex. 2 - Johnson Rebuttal, ¶ 10.)

17  Yet, Johnson and plaintiff fail to present any evidence demonstrating that potential

18  purchasers or others encounter the parties' marks in the manner presented.  *See*

19  *ComponentOne*, 2008 U.S. Dist. LEXIS 87066 at *80.

20          The defects in the Johnson report render it incapable of serving as admissible

21  evidence; hence, La Quinta cannot meet its burden on this essential issue.

22          **2.      The Johnson Survey's Underinclusive
                       Universe Renders It Objectionable**

23          In devising a likelihood of confusion survey, it is critical to define the target

24  universe or population.  Shari Seidman Diamond, "Reference Guide on Survey Research,"

25  in *Reference Manual on Scientific Evidence* 239 (Federal Judicial Center, 2d ed. 2000).

26  Because Mr. Johnson's survey interviewed respondents in only two cities in Arizona, it

1  did not capture a proper sampling of the relevant population, which should have been

2  representative of the United States population that otherwise met the criteria to participate

3  in the survey.  By excluding every state but Arizona, the sample is underinclusive, which

4  ordinarily offers no way to know what the unrepresented members would have responded.

5  *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263-64 (5th Cir. 1980).

6  As with his choice of stimulus, Mr. Johnson also has faced judicial criticism

7  concerning his selection of the universe.  *24 Hour Fitness USA, Inc. v. 24/7 Tribeca*

8  *Fitness, LLC*, 447 F. Supp. 2d 266, 281-82 (S.D.N.Y. 2006) (in a survey involving

9  Manhattan gyms, including respondents from Long Island and New Jersey made universe

10  too broad), *aff'd*, 247 Fed. Appx. 232 (2d Cir. 2007).  The court held that the inclusion of

11  a significant number of respondents who are not likely to be prospective consumers

12  eroded its probative value.  *Id.*

### 3.  The "Spontaneous" Comments Included in Johnson's Survey Overstate and Mislead the Results

13
14  Johnson counted as confused respondents who merely blurted out a spontaneous

15  comment at the beginning of the interview, but who manifested no other responses that

16  could support a conclusion that they were confused.  "[M]ere mention of La Quinta does

17  not mean that there was any confusion as to source or affiliation.   Mere mental

18  association is not evidence of a likelihood of confusion."  Hence, Dr. Mazis determined

19  that nine respondents should not have been tallied as confused.  (Mazis Decl., ¶ 16.)

### 4.  Inappropriate Coding Also Overstated the Results

20
21  Dr. Mazis concluded that Johnson should not have included as confused

22  respondents who answered any of the questions with "Quinta Inn" because of the

23  omission of the first component of plaintiff's mark, "La".  (Mazis Decl., ¶ 17.)

### C.  Plaintiff Cannot Establish Likelihood of Confusion

24
25  Plaintiff cannot establish the core element of its complaint, that is, whether

26  defendant's QUINTA REAL mark is likely to cause confusion with plaintiff's LA

1   QUINTA marks among an appreciable number of ordinarily prudent consumers. *See*

2   *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002).

3       Application of the Ninth Circuit's eight-factor test in *AMF Inc. v. Sleekcraft Boats*,

4   599 F.2d 341, 348-49 (9th Cir. 1979), militates against a finding in favor of plaintiff.

5   When the totality of the facts are considered, as opposed to plaintiff's "flash-card"

6   approach, the court must deny plaintiff's motion. *See Rodeo Collection, Ltd. v. West*

7   *Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987).

8                  **1.    Strength of the Mark**

9       The strength of a mark embodies two concepts – commercial recognition and

10   conceptual distinctiveness. *See Entrepreneur Media*, 279 F.3d at 1142 n.3; *Miss World*

11   *(UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988).  In other

12   words, plaintiff's advertising budget does not necessarily translate into conceptual

13   strength.  Indeed, plaintiff's co-existence without any apparent difficulty with the well-

14   known La Quinta Resort undermines plaintiff's contention that it has a unique mark

15   unused by any other.  (Stmt. ¶ 57.)

16                  **2.    Relatedness of the Services**

17       The Four Seasons restaurant in midtown Manhattan on East 52nd Street is located

18   blocks away from the Four Seasons hotel on East 57th Street.  Even though the hotel has

19   its own restaurant and both properties cater to high-end customers, the two separate

20   businesses have managed to co-exist and, indeed, thrive.  (Add'tl Facts ¶ 5.)

21       Plaintiff tries to make much out of the location of the proposed hotel in Tucson

22   relative to existing La Quinta hotels.  (Pl. SOF ¶ 64.)  But geographic proximity is not the

23   test; it is whether customers are likely to associate the two services with one another.

24   *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 633 (9th Cir. 2005); *Dreamwerks*

25   *Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998).

26       Although both parties provide lodging accommodations, the services are similar

1    only in the broadest sense. Moreover, the two hotels, were they to operate in the same

2    metropolitan area, would never charge comparable rates. (Espinosa Opp'n Decl., ¶ 7.)

3    Furthermore, as set forth in Quinta Real's Rule 56 Statement, La Quinta caters to value-

4    oriented consumers of hotel and motel services, as reflected by its relatively low price-

5    point and categorization as a limited-service or mid-tier lodging facility without food and

6    beverage. (Stmt. ¶¶ 42-43.) The amenities that each Quinta Real Hotel features are

7    offered at fewer than five percent of plaintiff's properties. (Stmt. ¶¶ 46-53.)

8         Finally, the striking contrast between the parties is reflected by the notable guests

9    that Quinta Real has had the privilege to host, including presidents, royalty, musicians,

10   athletes and celebrities. (Add'tl Facts ¶ 6.)

11   **3.    Similarity of the Marks**

12        Plaintiff's argument merely focuses on the fact that both marks include the word

13   "Quinta" (Pl. Mem. at 12), but this both ignores how the parties use their marks (Pl. SOF

14   ¶ 31; Stmt. ¶ 55, 56) and violates the fundamental dictate of the anti-dissection rule. In

15   determining likelihood of confusion, it is fundamental that "conflicting marks must be

16   compared in their entireties," not dissected into their component parts to be compared

17   with the corresponding component parts of the conflicting mark. 4 J. Thomas McCarthy,

18   *McCarthy on Trademarks & Unfair Competition*, § 23:41 (4th ed. 2009); *see also*

19   *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir.

20   1999) ("[T]he marks must be considered in their entirety and as they appear in the

21   marketplace."); *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993);

22   *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1226 (C.D. Cal.

23   2004), *aff'd*, 114 Fed. Appx. 921 (9th Cir. 2004). Moreover, under the "overall

24   impression" analysis, "there is no rule that confusion is automatically likely if a junior

25   user has a mark that contains in part the whole of another's mark." 4 *McCarthy*, § 23:41.

26        Thus, when the marketplace context associated with the parties' marks is

considered, the differences are striking.

### 4.      In More Than Twenty Years of Use,
### No Actual Confusion Has Occurred

As set forth above, plaintiff's survey has no probative value on the issue of confusion. In addition, there are no actual instances of confusion despite the parties' coexistence since at least 1986. (Stmt. ¶ 8.) Hence, this factor favors Quinta Real.

Unlike in the typical situation where a survey's target population is underinclusive, in this case, the Court has the benefit of a rebuttal survey by Dr. Mazis that included the representative population. The Mazis survey negates any actual confusion.

### 5.      The Marketing Channels Used By the Parties
### Do Not Overlap to Any Significant Degree

Plaintiff casts too wide a net by arguing that the parties operate in the same channels. Simply because both parties offer their goods on the internet "does not alone and as a matter of law constitute overlapping marketing channels." *Entrepreneur Media,* 279 F.3d at 1151. The radio and TV commercials put out by plaintiff convey a quirky message that is strikingly different from the refined elegance Quinta Real seeks to convey as an upscale, luxury resort. Favorable editorial coverage about Quinta Real in travel and lifestyle publications also highlights the differences. (Stmt. ¶ 20-23.) For instance, when *Conde Nast Traveler* magazine named Quinta Real Guadalajara among the 100 best hotels in the world (Stmt. ¶ 27), there was no mention – nor would there be – of plaintiff's La Quinta properties. This example illustrates the fundamental differences and perceptions of the parties' marks.

### 6.      Degree of Consumer Care

Given its core constituency and competitive set, plaintiff sits firmly in the limited-service or mid-tier lodging without food and beverage segment (Stmt. ¶ 43), along with Hampton Inn, Holiday Inn Express, Comfort Inn, AmeriSuites, Fairfield Inn, and others of the ilk. (Add'tl Facts ¶ 9.) Plaintiff offers no support for the contention that the "spontaneous comments" in its survey (Question 1) should be admissible; yet, plaintiff

1 relies on them to contrive the unsubstantiated illusion that the survey respondents, solely

2 in response to seeing two words, perceive a connection between the parties.

3           **7.**     **Defendant's Intent**

4       Quinta Real's evidence that it adopted its QUINTA REAL Marks without

5 knowledge of plaintiff remains unrefuted. (Stmt. ¶ 6.) Plaintiff's reliance on *Frehling*

6 *Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330 (11th Cir. 1999), is inapposite.

7 Unlike the present case, the defendant in *Frehling* failed to conduct a trademark search,

8 and even after the Trademark Office refused to register its mark based on likely confusion

9 with the plaintiff, the defendant used the infringing name, causing the court to find such

10 conduct manifested "intentional blindness" and improper intent. *Id.* at 1340-41.

11 Considering that Quinta Real has not yet opened a hotel in the United States and filed a

12 counterclaim seeking a declaratory judgment of non-infringement, plaintiff's attempt to

13 paint Quinta Real as an intentional malfeasor rings hollow, to say the least.

14           **8.**     **Likelihood of Expansion**

15       Plaintiff does not intend to establish any "five star" or "upper upscale" hotels.

16 (Stmt. ¶ 44.) Yet, it fails to explain how the parties would compete for the same guests,

17 especially in light of the rate disparity.

18 **II.**     **Plaintiff Cannot Prevail on Its Dilution Claim**

19       Plaintiff's one-paragraph explanation of its dilution claim is fatally defective. As a

20 threshold matter, plaintiff has not shown that its mark falls into the highly select group of

21 truly famous marks, such as PEPSI for soft drinks, *Pepsico, Inc. v. #1 Wholesale, LLC*, 84

22 U.S.P.Q.2d 1040, 1042 (N.D. Ga. 2007), NIKE for athletic footwear and apparel, *Nike,*

23 *Inc. v. Nikepal Int'l, Inc.*, 84 U.S.P.Q.2d 1521, 1526 (E.D. Cal. 2007), and STARBUCKS

24 for coffee, *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 105 (2d Cir.

25 2009).

26       As far as the remaining elements of proving trademark dilution, plaintiff has offered

1  no argument whatsoever, which must be construed as a failure of proof, thereby requiring

2  its motion to be denied on the dilution claim.

3  **III.   PLAINTIFF'S "USE IN COMMERCE" ARGUMENT
   IS INCONSEQUENTIAL AND INAPPLICABLE**

4          Since this case is not before the Trademark Trial and Appeal Board and priority is

5  not disputed, plaintiff's unyielding adherence to its argument that Quinta Real has not

6  used its marks *in commerce* is a red herring.  Use in commerce is a construct within the

7  Lanham Act as a predicate to establishing trademark rights.  Plaintiff conflates the

8  statutory concept of "use in commerce" with Quinta Real's actual use of its mark for more

9  than twenty years by advertising in the United States and booking reservations from

10 thousands of American citizens.  (Stmt. ¶ 5.)  Thus, Quinta Real's active business dealings

11 within the United States cannot be excluded from the equation.[2]

12         Nevertheless, under the Lanham Act, a service mark is used in commerce when "it

13 is used or displayed in the sale or advertising of services and the services are rendered in

14 commerce."  15 U.S.C. § 1127.  The Ninth Circuit has held that, under certain

15 circumstances, "trademark rights can vest even before any goods or services are actually

16 sold."  *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th

17 Cir. 1999).  Use of the mark must be "sufficiently public to identify or distinguish the

18 marked goods in an appropriate segment of the public mind as those of the adopter of the

19 mark."  *Id.* (citing cases).

20         The Ninth Circuit has adopted a "totality of the circumstances" test in evaluating

21 whether a service mark has been used in commerce in a manner sufficient to entitle it to

22 Lanham Act protection.  *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1159 (9th Cir.

23 2001).  The court must look to "the totality of the parties' activities."  *Id.* at 1158 (citing

24 *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1200 (9th Cir. 1979)).  In

25

26 _____
       [2]  By taking this position, Quinta Real does not waive its affirmative defense of
    laches.  (*See* Def. Mem. in Support of Summary Jt., Point III.)

1   applying this totality of the activities test, courts should be guided by such considerations

2   as the genuineness and commercial character of the activity, the determination of whether

3   the mark was sufficiently public to identify or distinguish the marked service in an

4   appropriate segment of the public mind as those of the holder of the mark, the scope of the

5   non-sales activity relative to what would be a commercially reasonable attempt to market

6   the service, the degree of ongoing activity of the holder to conduct the business using the

7   mark, the amount of business transacted, and other similar factors which might distinguish

8   whether a service has actually been "rendered in commerce."  *Id.* at 1159-60 (activities

9   included use of mark as part of business name, public relations campaign, delivery of

10  brochures to potential customers, and interviews with major newspapers); *see also In re*

11  *Casino de Monaco Trademark Litigation*, No. 07 Civ. 4802 (DAB), 2010 U.S. Dist.

12  LEXIS 33950, at *24 (S.D.N.Y. Mar. 31, 2010) (promotion and advertising in U.S. of

13  casino services conducted in Monaco show that mark actually was used in United States

14  and entitled to protection notwithstanding casino operator's lack of "territorial connection

15  with the United States").

16      Quinta Real's use is significant, public and directed to consumers.  (Stmt. ¶¶ 20-

17  31.)

18      *Grupo Gigante SA de CV v. Dallo & Co., Inc.*, 391 F.3d 1088 (9th Cir. 2004), does

19  not warrant a different conclusion because priority is not in dispute, and, therefore, the

20  territoriality principle is not implicated.  The only issue the Court here must decide is

21  whether there is a likelihood of confusion.

22                      **CONCLUSION**

23      For all the foregoing reasons, Quinta Real respectfully requests that the Court deny

24  plaintiff's motion for summary judgment.

25

26

Dated:   New York, New York
         August 19, 2010

Respectfully submitted,

**COLUCCI & UMANS**


By: s/Frank J. Colucci
    Frank J. Colucci (FC-8441)
    *Admitted Pro Hac Vice*
    Richard P. Jacobson (RJ-2843)
    *Admitted Pro Hac Vice*
    218 East 50th Street
    New York, New York  10022-6018
    FColucci@Colucci-Umans.com
    RJacobson@Colucci-Umans.com
    Telephone:  212.935.5700
    Facsimile:   212.935.5728


OF COUNSEL:
    Timothy J. Franks
    Perkins Coie Brown & Bain P.A.
    Suite 2000
    2901 North Central Avenue
    Phoenix, Arizona  85012-2788

Attorneys for Defendant/Counterclaimant
Q.R.T.M., S.A. de C.V.

1

**CERTIFICATE OF SERVICE**

2      ☒      I hereby certify that on August 19, 2010, I electronically transmitted the

3  attached documents to the Clerk's Office using the CM/ECF System for filing and

4  transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5         Mark A. Nadeau (mark.nadeau@dlapiper.com)

6         Kate Elizabeth Frenzinger (kate.frenzinger@dlapiper.com)

7         Allison Leigh Kierman (allison.kierman@dlapiper.com)

8         Joseph C Gioconda (joseph.gioconda@giocondalaw.com

9

10      ☒      I hereby certify that on August 19, 2010, I served a copy of the attached

11  document by FedEx on Judge Raner C. Collins, United States District Court of Arizona,

12  405 West Congress Street, Tucson, Arizona 85701.

13

14                                   s/ Richard P. Jacobson

15

16

17

18

19

20

21

22

23

24

25

26