```
 1                    UNITED STATES DISTRICT COURT

 2                        DISTRICT OF ARIZONA

 3

 4  LA QUINTA WORLDWIDE LLC,      )
                                  )
 5                 Plaintiff,     )
                                  )
 6  vs.                           )   CV-09-175-TUC-RCC
                                  )
 7  Q.R.T.M. SA de CV,            )
                                  )
 8                 Defendant.     )   Tucson, Arizona
    _____)   January 24, 2011
 9

10

11                  TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE RANER C. COLLINS
12                 UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  On Behalf of the Plaintiff:    Mr. Joseph C. Gioconda
                                   Gioconda Law Group PLLC
15                                 1 Penn Plaza
                                   36th Floor
16                                 New York, NY  10119

17                                 Ms. Robyn Fuller
                                   Assistant General Counsel
18                                 La Quinta Worldwide LLC

19  On Behalf of the Defendant:    Mr. Frank J. Colucci
                                   Mr. Richard P. Jacobson
20                                 Colucci & Umans
                                   218 East 50th Street
21                                 New York, NY  10022

22

    Court Reporter:                Aaron H. LaDuke
23                                 Official Court Reporter
                                   U.S. District Court
24                                 405 W. Congress St.
                                   Tucson, AZ  85701
25
```

<u>P R O C E E D I N G S</u>

1

2    THE CLERK:  Civil 09-175, La Quinta Worldwide LLC

3 versus Q.R.T.M., on for a motion hearing.

4    Counsel, state your appearance.

5    MR. GIOCANDA:  Joseph Gioconda of the Gioconda Law

6 Group for plaintiff, La Quinta, Your Honor.

7    THE COURT:  Good afternoon.

8    MR. GIOCANDA:  Good afternoon.

9    MR. COLUCCI:  Good afternoon, Your Honor.  Frank

10 Colucci, Colucci & Umans, for the defendant, Quinta Real.

11    THE COURT:  Good afternoon.

12    MR. COLUCCI:  Thank you, Your Honor.

13    THE COURT:  We have competing motions for summary

14 judgment.

15    MR. COLUCCI:  We do, Your Honor.

16    THE COURT:  Who filed them first?

17    MR. COLUCCI:  I think we both started them exactly

18 the same day.

19    THE COURT:  Okay.  Who was first in time?

20    MR. COLUCCI:  In what way?

21    THE COURT:  Well, 3:00 o'clock versus 4:00 o'clock.

22    MR. COLUCCI:  We were here first.

23    THE COURT:  Okay.  You were here first, if that makes

24 any sense.

25    Go ahead.  I'll let you go first.

1          MR. COLUCCI:  Thank you.

2          THE COURT:  You'll both get to speak twice.

3          MR. COLUCCI:  If it may, Your Honor, as we see it,

4    the issue in this case is whether, after 25 years of

5    contemporaneous use by the parties to this action and the use

6    of their respective names and marks during all that period of

7    time and their different marketing channels both in the United

8    States and in Mexico, without there ever being a single

9    instance of any actual confusion during all of that time from

10   either the trade or the public, whether La Quinta is entitled

11   to a summary judgment in its favor granting it the permanent

12   injunction, a nationwide permanent injunction, against Quinta

13   Real's use of its name and its marks in the United States in

14   connection with a hotel which someday may be either developed

15   or operated by Quinta Real.

16       And what is all this based on?  Two things:  Based upon

17   an intent, a letter of intent that Quinta Real signed back in

18   June of 2007 with a developer here in Tucson named Gadsden to

19   operate a hotel in the downtown area which is going to be, or

20   was going to be at the time, part of a City of Tucson

21   redevelopment project.  That was in June of 2007, which has

22   long since been abandoned by Quinta Real.  In fact, the entire

23   project has been on hold for all of these years.  And as one

24   city councilwoman put it back in the days of 2007, when this

25   project was being considered, "I don't think it's ever going

1  to be built; and if it is, it will be a miracle."

2      Also, the other ground for the basis for their complaint

3  is a survey which was conducted in 2009, shortly before the

4  complaint was filed, the complaint being filed in March of

5  2009, by Philip Johnson, a survey expert, which involved

6  approximately 306 interviews with respondents, all taken down

7  here in the Arizona area, Tucson and Phoenix, by the use of

8  some flashcards, these cards being an 8½-by-11 with the name

9  "Quinta Real" in block letters and some questions about the

10 residents, what they think about these things.

11      We'll go into it a little further later on, Your Honor,

12 if I may, to simply say at this particular point, that survey,

13 if you call it a survey, is so flawed that not only is it not

14 entitled to any weight, if this case were to ever go before a

15 jury, I doubt that it would ever survive a *Daubert* challenge.

16      So we submit that there is no evidence at this stage,

17 after 25 years of contemporaneous use by these parties, of any

18 likelihood of confusion; and on that basis there is no

19 genuine issue of material fact with respect to La Quinta's

20 motion for summary judgment.  It should be denied outright.

21 Since there is no evidence of any likelihood of confusion, our

22 motion for summary judgment should be granted.

23      I think that the issue can be determined based on the

24 salient, undisputed facts of record in this case.  There are

25 obviously a lot of undisputed facts, but I think the salient

1  ones are sufficient to decide the issue as to whether there's

2  any likelihood of confusion.  So if I may, I would just like

3  to go through a little bit of the summary of what is

4  undisputed.

5          THE COURT:  There are no Quinta Real hotels in the

6  U.S. presently.

7          MR. COLUCCI:  That is correct, Your Honor.

8          THE COURT:  The first one that was about to be built

9  was the one here in Tucson.

10         MR. COLUCCI:  That's correct, Your Honor.

11         THE COURT:  Of course, if they wait until you finally

12 build one, you would say, "You should have filed your action

13 when you thought about us here in Tucson."  Wouldn't you say

14 that?

15         MR. COLUCCI:  Yes, we would say that.  And we would

16 say even before that, Your Honor, because it was in 1994 when

17 we signed a letter of intent to build or operate a hotel in

18 San Antonio, Texas.

19         THE COURT:  That didn't get built, either.

20         MR. COLUCCI:  That didn't get built, either; right.

21         THE COURT:  I'm sorry.  Go ahead.  I didn't mean to

22 throw you off-track.

23         MR. COLUCCI:  We still have a continuing interest in

24 doing so, but obviously we are being threatened here.  It

25 means that if you grant their motion for summary judgment, we

1  could never build a hotel in the United States.

2  THE COURT:  Not called Quinta Real, anyway.

3  MR. COLUCCI:  Called Quinta Real, yes, Your Honor.

4  And I think that with the facts of this case showing that the

5  extent to which we have used our mark, Quinta Real, and our

6  trademarks, Quinta Real, here in the United States over the 25

7  years that we've been promoting our hotels in Mexico and the

8  reputation that we have established here and the goodwill that

9  we have established among the residents here -- literally

10  thousands of people have come to the Quinta Real hotels in

11  Mexico, know the hotel, know Quinta Real.  The travel guides

12  all promote it.  The guide books have established Quinta Real

13  here in the United States as being one of the most luxurious

14  and one of the hundred best hotels in the world today.  They

15  are known throughout the United States.

16  We are not saying we are famous here, but we certainly

17  have an established goodwill and reputation that any

18  responsible company would want to take advantage of if they

19  were going to build a hotel in the United States.  Sure, we

20  could build a hotel without the name Quinta Real, but what is

21  that doing for us in the sense of taking advantage of our

22  reputation?  And there's been no objection.  This has gone on

23  for 25 years in the United States.  Not a single person has

24  indicated any confusion.  None of the residents that have been

25  to our hotels with Quinta Real, none of their franchisees have

1  objected.  None of their travel agents have objected.  No one

2  has ever objected.

3      So it's also undisputed, and I think this is one of the

4  main issues, is that the two parties, although they are in the

5  hotel business as you might put it, that is a very broad sense

6  of what they do.  We have to look at how they are interacting

7  in this particular business, and they are like night and day

8  in this business.

9      La Quinta, obviously, has a number of hotels and motels

10  throughout the United States.  They cater to -- they call

11  themselves a mid-tier limited service organization, and that's

12  what they are.  Their room rates are in the low $39 up to $89

13  for travelers.  They don't have many amenities in their hotels

14  and motels.  Yes, of course they have some, and you are going

15  to see them.  There's maybe less than 5 percent of their

16  hotels have these amenities.

17      On the other hand, the Quinta Real hotel is one of the

18  most luxurious hotels in the world today.  Their rates are, at

19  least in Mexico, very high; and if they were to come to the

20  United States, they would be along the lines of a Four Seasons

21  or Ritz Carlton.  They would be very, very expensive.  They

22  are in a completely different category.  Their travel agents

23  are the upscale travel agents that cater to the upscale

24  business traveler.  They have amenities that have earned

25  them -- in fact, every one of their properties in Mexico is a

1  four-diamond-rated hotel.

2      This is the kind of marketing concept, this is the kind

3  of marketing area that Quinta Real is in; and this is the

4  marketing area that La Quinta is in.  They are two completely,

5  diametrically opposed marketing channels.  None of their chain

6  is going to meet.  That's our position.  There is no

7  likelihood of confusion.  There's been none and there won't be

8  any.

9      With this background, the first time that we ever heard

10 of any objection come from La Quinta in the 25 years took

11 place back in 2003.  Now before 2003 -- now we are talking

12 about in the United States Patent and Trademark Office.  We

13 are not talking about in the courts.  We are not talking about

14 cease and desist letters.  We are talking about Quinta Real

15 going to the United States Patent and Trademark Office and

16 attempting to register its trademarks in the United States.

17     Now the first trademark that it registered, actually was

18 successful in registering, was a trademark consisting of the

19 letters "QR" in an oval design.  That was filed in 2001 in the

20 United States Patent Office.  It went through to registration.

21 It was never opposed by La Quinta, and it became a

22 registration in 2003.

23     So the next application that Quinta Real filed in the

24 Patent Office was a trademark consisting of the very same

25 trademark with a "Q" and an "R" in the oval design and right

1  below it the words "Quinta Real," name of the company, and

2  then below that, in smaller letters, "Grand Class Hotels and

3  Resorts."  That was the entire trademark.

4      That was the first time, in 2003, that La Quinta came in

5  and opposed the registration of that trademark; and the

6  parties then began and were in the basis of an opposition

7  proceeding which had only to do with the right to register

8  that trademark.  It had nothing to do with the use at that

9  time.

10      Between 2003 and I can't remember the next year, but I

11  think it was maybe 2007, La Quinta was involved in a

12  litigation in California with another company.  It was a club,

13  a resort club in La Quinta, California, which had been in

14  existence long before La Quinta, actually since 1926, and it

15  was called La Quinta Resort Club.  And they were involved in

16  some litigation with them.  To make a long story short, that

17  litigation was resolved; and as a result of the resolution,

18  they entered into what they call a concurrent use registration

19  in the Patent Office, where all of La Quinta's trademark

20  registrations now bear a legend showing that registration is

21  concurrent with this La Quinta Resort Club in California, and

22  that was a result of a settlement discussion.  So now we have

23  two companies in the United States with practically the

24  identical mark -- La Quinta Resort Club has a reputation as

25  well -- and they're all on their registrations.

 1      During the opposition in the Patent Office between La

 2  Quinta and Quinta Real, we, Quinta Real, produced to La

 3  Quinta's attorneys documentation which was copies of news

 4  articles that had appeared in the Tucson press talking about

 5  this letter of intent.  That's how they found out about it.

 6  The letter of intent was dated, as I said before, in June of

 7  2007.

 8      With that in mind, they then went out and, in addition to

 9  continuing on with the opposition, they then petitioned to

10  cancel our earlier registration of "Q" and "R," and then there

11  was a consolidated proceeding.  And now we're turning to

12  somewhere around 2008, 2009.  La Quinta's attorneys go out and

13  they have this survey made, which I talked to you about

14  earlier, and they bring this complaint which is for a

15  preliminary injunction, a permanent injunction, et cetera.  In

16  fact, they are asking for damages and attorneys' fees and all

17  kinds of other relief.

18      We told them at that time, in 2009 when we received the

19  complaint, that we are not going ahead with this proceeding in

20  Tucson.  It's been long talked about.  It's going nowhere.  We

21  have abandoned it.  They pressed ahead anyway.  That's where

22  we are.

23      There are two sets of claims that they have made in their

24  complaint, if we just summarize them, and the first claim is

25  trademark infringement and unfair competition; and the second

1  claim is dilution under the federal statute.

2       The legal arguments, as Your Honor is well aware based on

3  the Ninth Circuit's decision in *AMF against Sleekcraft*, now

4  called the *Sleekcraft* factors, involve eight different factors

5  that should be considered in evaluating the issue of

6  likelihood of confusion.  They include the strength of the

7  mark, the relatedness of the services, the similarity of the

8  names, whether there's any actual confusion, the marketing

9  channels, the degree of care that purchasers exercise, the

10 intent of Quinta Real in selecting its name, likelihood of

11 expansion into other businesses, and those are the eight

12 factors.

13      I think that if we take each one of them, and I'll try to

14 summarize it as quickly as I can, I think all of those factors

15 are in favor of Quinta Real.  But as Your Honor is aware also,

16 it's not a situation where you just add up which has the

17 factor -- in whose favor each factor is and then see who gets

18 the most points.  Some of these factors are more important

19 than others, but it's a way of determining if there is any

20 likelihood of confusion.

21      So if we begin with the strength of the mark, we are

22 looking at the trademark La Quinta -- and, oh, by the way,

23 what they do in their papers, they refer to the La Quinta

24 marks collectively.  Now I think Your Honor knows that the La

25 Quinta marks include the words "La Quinta" and also various

1  design forms.  For example, La Quinta uses a sunburst design

2  on many of their signs.

3      So those signs, those other designs, we submit, are not

4  close to any of the signs that we use.  It really comes down

5  to are the names, the word names "La Quinta" and "Quinta

6  Real," likely to cause confusion.  I think that as Your Honor

7  looks at the designs, you'll see that they are not anywhere

8  similar.

9      So if we are looking at the strength of the mark, we are

10  talking about the La Quinta name.  They argue that they have a

11  family of trademarks, but that's never been legally determined

12  by any court or the Patent Office that we know of.  They are

13  using that term, to my mind, as simply common word usage and

14  not a legal finding on their part.

15      So when we consider whether La Quinta -- the strength of

16  the La Quinta mark, we are not looking to attack the

17  registrations.  We are not trying to attack their marks in any

18  way, shape, or form.  What we are saying is, look, "La Quinta"

19  means country house.  That's stated in their registrations.

20  Our mark is Quinta Real, which means royal villa.  "Quinta" is

21  also used to mean "estate" or "farm" or even the word "fifth."

22  It has various meanings.  We see those words as being akin to

23  the use of the word "inn."  They're lodgings.  They have a

24  reference to come to a country house, come to a royal villa.

25      As a matter of fact, when we applied to register our

1  second trademark in the Patent Office, which was "QR" --

2  Quinta Real -- "Grand Class Resorts," the Patent Office there,

3  the examiner told us to disclaim the word "Quinta."  We also

4  had to disclaim "Grand Class Hotels and Resorts" because these

5  words, in the trademark examiner's viewpoint, were

6  descriptive.

7       When you have a descriptive mark or a highly suggestive

8  mark, those are considered to be weak marks.  The purpose of

9  determining the strength of a mark, even where it's

10  incontestable and even where it's well-known, is to say, well,

11  how far are we going to extend this mark to the protection

12  it's entitled to; and that determines again the strength of

13  the mark, the inherent strength of the mark, not whether it's

14  well-known or whether it's famous or not.

15       So when you look at the strength of the mark "La Quinta,"

16  we say that is a conceptually weak mark and, since our mark

17  has "Quinta" in it, that you cannot base a likelihood of

18  confusion just on the basis of a weak or descriptive term.

19       Also, the parties never use the word "Quinta" alone.

20  It's always "La Quinta" for them or "Quinta Real" for us.  And

21  it's well-established that when you are comparing trademarks

22  that you compare them in their entireties, not dissect them,

23  not do anything like that.  The other side argues that

24  "Quinta" is dominant in both trademarks.  Well, "Quinta" is

25  not dominant in our mark.  It's used together.  It would make

1  no sense just using "Quinta" alone.  It's "Quinta Real."  It

2  has a meaning.

3       When we talk about the relatedness of services, I touched

4  on this before, that really we are in completely different,

5  diametrically opposed marketing channels.  Our rates are

6  completely different from theirs.  The type of amenities we

7  have are completely different.

8            THE COURT:  Don't some of the rates overlap, though?

9            MR. COLUCCI:  Well, that's what they are claiming,

10 but they don't.

11      They do have some hotels -- and as I said before, less

12 than 5 percent -- which I think they are going to show you, I

13 think in Chicago, where they are getting a higher rate than

14 they normally get at their motels.  But when we look at our

15 rates, Quinta Real's rates, we are up almost to like 500 or

16 1,000 or 1500 a night.  And we are looking at Mexican rates

17 also which, if they were to come to the United States, would

18 be much higher.

19      Also, the rates would be determined based upon the

20 locations of where these hotels or where these motels are

21 going to be located.  In some cities like New York, they would

22 be much, much higher in price.  So if they are looking at

23 building a hotel in Chicago and their rates are $400, for

24 example, which I think in some cases they're arguing, our

25 rates are going to be three times that.  We are looking at

1  competing with our own competition, and our own competition

2  is, as I said before, hotels like the Four Seasons or Ritz

3  Carlton.  So there's never going to be any overlapping in that

4  sense.

5      Even if during a very important season where rates are

6  high because there's some event going on in that city and

7  everybody raises their rates, they're going to be raised

8  accordingly.  But there's no real true overlapping when you

9  look at the majority of their hotels and motels are in the $80

10 or $90 a night, and ours would be nowhere there.

11     Even when we did the survey, the survey, which they

12 started, assumed that there would be a rate of at least $150

13 per night.  Now that's even low from Quinta Real's standpoint,

14 way low, but we used that because we wanted to replicate their

15 survey and show that even with that rate there would be no

16 likelihood of confusion.  But I disagree that there would be

17 overlapping to any real significant aspect.  So with respect

18 to the relatedness of services, we take the position that they

19 are not related.

20     The similarity of the names, once again, La Quinta and

21 Quinta Real, they are different.  There's some similarity, of

22 course, in the fact that they both include the word "Quinta,"

23 but that is not sufficient to make them confusingly similar.

24     The fact that they are similar in name, with "Quinta,"

25 doesn't make them confusingly similar.  As we can see from

1   some other cases, for example, there's the *Entrepreneur* case

2   where we had "Entrepreneur" and "Entrepreneur PCT"; we had the

3   *Century 21* case with "Century" and "Century 21"; the Ms. World

4   and I think it was Ms. Pageant cases, so it doesn't mean just

5   because the marks are similar that they're confusingly

6   similar.

7       Also, we have the resort in California which adds to the

8   mix.  That can coexist without any confusion, apparently, with

9   them.  They don't have any problem with that.  There's other

10  trademarks that have been registered in the Patent and

11  Trademark Office that have "Quinta" in their name, although

12  not the hotel services, which they would have to be disclaimed

13  as well.

14      As far as the next factor, which is actual confusion,

15  again, there's been no actual confusion, and that's an

16  undisputed fact and an admitted fact.

17      The marketing channels, again, the fact that everybody is

18  on the Internet these days doesn't make that confusingly

19  similar because we are on the Internet.  We don't go out and

20  advertise in billboards and magazines and newspapers like they

21  do.  That's not how luxury hotels advertise their services.

22  So there's no overlapping there.

23      The guide books and the travel guides, they would be

24  categorized primarily by price, location.  We have never seen

25  any advertisement or any promotional material that mentions

1  the two companies together in one publication or talks about

2  them similarly.  They're completely separate when it comes to

3  travel guides and when it comes to any articles that have been

4  written about the travel business or about hotels in the

5  travel business.  We've never seen a single thing where they

6  are both mentioned, and there's been no confusion.

7      The degree of care of purchasers:  Well, if somebody is

8  paying a huge amount of money during a stay, well, they

9  certainly know where they are staying, and they are not going

10  to be confused into thinking that La Quinta is certainly the

11  same as Quinta Real.  The price alone would be a determining

12  factor that they know that they are not confused to which

13  hotel they are staying at.  And we have no evidence that

14  anybody's ever been confused.  Nobody's ever complained.

15  You've got 800 franchises across the United States or 800

16  motels and hotels of La Quinta, and no one's ever said

17  anybody's complained about being connected or associated with

18  Quinta Real.

19      As far as intent is concerned, Quinta Real selected that

20  name back in the mid-1980s, and it was selected by the founder

21  of the company, whose son is here today in the courtroom, who

22  is the vice president of Quinta Real; and it was selected to

23  maintain the Mexican heritage and to be used in connection

24  with a luxury hotel, which at the time Mexico did not have.

25  That was one of the impetuses for his founding Quinta Real,

1   that at that time there was no luxury Mexican hotels, and it

2   was his dream to have such a property, and over the years he

3   has developed that reputation.

4       The likelihood of expansion into each other's market:

5   Well, it's very unlikely that if we came to the United States

6   that we would be going downstream by trying to compete with La

7   Quinta and starting to open motels and hotels in competition

8   with them.  We have a luxury name.  We have a luxury brand.

9   We have goodwill and reputation.  We are not going to take

10  that downstream.  And from their standpoint, they seem to be

11  wanting to come up a little bit in some of their places, but

12  they are never going to get up to the standpoint of a

13  four-star or four-diamond-star-rated hotel.  In fact, they

14  admit that that's the case.

15      So if you weigh all the factors, it would seem to me,

16  Your Honor, I would suggest that the factors weigh in favor of

17  Quinta Real that there is no likelihood of confusion and there

18  is no trademark infringement and there is no unfair

19  competition.

20      Their other claim is a little mysterious and, from what

21  we can see, not really fully briefed.  This is the dilution

22  claim, and this is the one where they are claiming now that

23  their trademark, "La Quinta," is a famous trademark worthy of

24  this protection of this federal statute that says if a

25  trademark is famous that it would be entitled to span all

1  classes of goods and prevent other companies from taking the

2  same mark and using it for totally unrelated goods or

3  services.

4      The federal dilution statute, Your Honor, has been

5  amended recently, in October of 2006, as a result of the

6  *Victoria's Secret-Moseley* case which says that you have to

7  show a likelihood of dilution.  But the fact is that only an

8  extremely small, select group of trademarks are entitled to

9  that kind of broad protection.

10     Now La Quinta claims that their marks are famous.  In

11 their complaint they say they are famous in Arizona.  They say

12 they are well-known and famous, and well they may be for hotel

13 services, but they are not famous as viewed by the dilution

14 statute.  They are not a trademark that would span other

15 classes of goods beyond hotel services, and so in that sense

16 they are not famous and they are not entitled to dilution

17 protection.

18     Now the courts say that that is the threshold issue, that

19 the courts should not go beyond that.  First, they should find

20 whether the mark is famous.  If they say the mark is famous,

21 then we go over to the other factors, which we will discuss.

22 But I'm saying that at that point, their mark is not famous.

23 They have not established it as famous.  They have not come up

24 with any survey to show that it's famous or any other evidence

25 that I'm aware of.  So I think at that particular stage, their

1   dilution claim should be dismissed on its face.

2       However, if the Court should find that it's a famous

3   mark, then the next issue is, what mark has it taken and is

4   "Quinta Real" dilutive of the "La Quinta" name.  In this

5   respect, when you come to this issue of whether "Quinta Real"

6   is likely to dilute "La Quinta," you have to take a different

7   look at the trademarks.  You cannot look at them as you would

8   under a likelihood of confusion test for trademark

9   infringement.

10      Under the dilution statute, the trademarks that you are

11  looking at have to be either identical or nearly identical,

12  not just similar and not just substantially similar.  They

13  have to be much, much closer, and the courts say they have to

14  be identical or nearly identical.  And our position is that

15  "Quinta Real" and "La Quinta" are not identical.  They are not

16  nearly identical at all.  They are different in meaning,

17  they're different in pronunciation, they're different

18  in appearance, and so they would not or should not come under

19  that theory.

20      The other remaining issue in the case is the issue of

21  laches.  Again, we could not find any case where a court has

22  enjoined somebody after 20 years of contemporaneous use, no

23  objection, no likelihood of confusion, no actual confusion,

24  and all they have is this survey, which I would just like to

25  talk to you about just for two minutes.  I may be way over my

1  time, but I apologize.

2           THE COURT:  I think you are.

3           MR. COLUCCI:  Do you want me to stop or should I --

4           THE COURT:  Go ahead.  You said two minutes.

5           MR. COLUCCI:  Thank you.

6       The methodology that was used in that survey has been

7  seriously criticized by practically every court that has had

8  to consider the use of flashcards in making a survey.  In

9  fact, the survey expert that took the survey had, himself,

10 been criticized by at least two courts because the survey is

11 supposed to, number one, replicate to the extent it can the

12 marketplace conditions; and there is no attempt in his survey

13 to replicate any kind of marketplace considerations or context

14 in which somebody would be likely to encounter the Quinta Real

15 hotel or name.

16      It's simply a word association test, which is, what do

17 you believe, do you believe this has got a connection, and

18 tell me what you believe.  And that's just guessing.  That has

19 no value whatsoever in our area of trademark practice, and it

20 is so flawed that it's impossible to even have any

21 consideration whatsoever.

22      The other aspect is they are looking for a nationwide,

23 permanent injunction, and the survey only covered residents in

24 Arizona.  According to the surveyor, he says this is

25 projectable outside Arizona.  I don't know how he can maintain

1    that.  It's an incredible statement.  Certainly if a court was

2    sitting in Florida and somebody was going to build a hotel

3    there, they are not going to look at a survey that was taken

4    in Arizona to say whether there's going to be likely confusion

5    in Florida.  It's not projectable, so it falls on that basis.

6    The methodology falls, the projectability falls, and finally

7    the questions that are used, no relation to anything, just:

8    Here's a card.  Think of it as a hotel.  What are your

9    thoughts?  That's not survey evidence.

10        On the other hand, we presented a national survey, 16

11   cities, 400 and -- I can't remember -- 60 or 400 and whatever

12   respondents.  We showed that less than 5 percent of those

13   surveyed showed any likelihood of confusion with La Quinta.

14   And under the established law in trademark circles, anything

15   less than 10 percent, in terms of a survey, is evidence of no

16   likelihood of confusion.

17        And on top of all of that, regardless of even the

18   surveys, the best evidence of no likelihood of confusion, Your

19   Honor, we submit, is the fact that there's been no confusion

20   in over 25 years.  Thank you.

21             THE COURT:  Thank you.

22             MR. GIOCANDA:  Good afternoon, Your Honor.

23             THE COURT:  Good afternoon.

24             MR. GIOCANDA:  If I may, I have some boards that are

25   blow-ups of portions of the record to illuminate some of the

1  points that I would like to make both in support of La

2  Quinta's motion for summary judgment in this case and in

3  opposition to Quinta Real's motion.

4      I have here some portions of the record that show

5  photographs of just a few of the nearly 800 La Quinta

6  properties that exist across the United States.  Far from the

7  cookie-cutter motel motif that the defendant would like to

8  present, in fact, La Quinta's properties are rather diverse

9  and exist in, I believe, all 50 states; if not all 50, close

10  to all 50.  You have one in Colorado, the New York property

11  here, the Chicago property on the bottom left, and a property

12  in Texas, on the bottom right, among many, many others.

13      The La Quinta properties, in terms of the price range,

14  which is something that has been brought up, range very much

15  so in terms of price.  As you might imagine, properties that

16  are in downtown areas at times can be rather expensive, and

17  there's evidence in the record that they can approach 4 or

18  $500 a night, and some of the properties are on average 90 to

19  $100 a night.  I think that's not in contrast but actually

20  rather similar to the Quinta Real properties, which, it's in

21  the record, average under $200 a night across all the nine

22  Quinta Real properties.

23      So with all due respect to my adversary, who said that

24  500 or 1,000 or 2,000, some of their rooms and some of their

25  properties may approach that at times, but the average room

1  rate is under $200 a night for the Mexican properties.

2      With respect to what the United States properties would

3  be if Quinta Real were to build, we asked them that, and the

4  truth was they don't know.  The truth is that they haven't

5  figured that out yet because they don't know that they can

6  provide the amenities in the United States, because they're

7  more costly here than in Mexico.  So they don't know that they

8  can, in fact, charge the rates that they would like to charge

9  in the United States because they haven't yet figured out how

10  to build a hotel that could do that in the United States.

11      So it is extremely likely, Your Honor, given the current

12  state of facts and the realities that are in the record, that

13  there would be overlap between the parties' room rates.

14      The fact is that both parties are hotels.  Both parties

15  would offer, if the defendant were to have its way, room

16  services, hotel services in the exact same geographic

17  vicinity.

18      I have here, which is in the record as Exhibit 19 to

19  Mr. Trivedi's declaration, the current La Quinta hotel

20  directory, and I can show you that it has multiple properties

21  near Tucson, Arizona, and in fact it has properties all

22  throughout the United States.  The defendants have looked at

23  properties and explored not only the Tucson market but New

24  York, Miami, Texas, which he mentioned, San Antonio.  This is

25  where La Quinta has been doing business since the 1960s.

1        So with respect to the amenities that La Quinta currently

2   offers, these are not exceptional amenities.  These are the

3   standard amenities in many of the La Quinta properties that

4   exist.  In fact, these are amenities, some of them, in the La

5   Quinta I stayed at last night here in Tucson, eight miles from

6   here.  These are not exceptions.

7            THE COURT:  You stayed at a La Quinta here in Tucson?

8            MR. GIOCANDA:  I sure did.

9            THE COURT:  Star Pass was just up the street.

10           MR. GIOCANDA:  The La Quinta properties in Tucson,

11  Arizona, throughout the state of Arizona and throughout the

12  United States are of exceptionally high quality.  And with

13  respect to that, the La Quinta marks are strong and well-known

14  for hotel services.  The plaintiff has used the name "La

15  Quinta" in connection with hotels and motels since 1969.  La

16  Quinta owns 19 valid and enforceable federal trademark

17  registrations that incorporate the word mark "La Quinta" for

18  hotel services, and we have nearly 800 hotels, including

19  numerous in Arizona.  In fact, one operates near the very

20  location where the defendant wanted to build its first United

21  States-based hotel.

22       Consequently, La Quinta has registered over these decades

23  these registered marks.  We call these a family of marks,

24  meaning that they all share a common denominator.  What is

25  that?  "Quinta."  The word "Quinta" appears on the front of

1  every La Quinta property.  It appears on the front of the

2  directories.  It appears in all of its advertising, in various

3  forms over these decades, various sunbursts, logos; but the

4  common denominator across all of the marketing has been La

5  Quinta.

6      Consequently, the United States Patent and Trademark

7  Office recognized the incontestability of the La Quinta word

8  mark for hotel services in 1983.  In contrast to my

9  adversary's argument that it is a, quote-unquote, merely

10  descriptive word, although it begs the question what "Quinta"

11  is descriptive of to the average American who may not know

12  Spanish, the fact is, that defense is not available.  That

13  defense is not available because the mark was deemed

14  incontestable, and therefore it cannot be found merely

15  descriptive, despite what the defendant would like to have

16  this Court believe.

17      Your Honor, because of La Quinta's long history in hotel

18  and motel services, because of its 19 federal trademark

19  registrations, some of which are incontestable, such as the

20  word mark, and its use with millions of guests and millions of

21  dollars in advertising, tens of millions in advertising every

22  day on nationwide television and radio and billboards and

23  mailers, because of that, in the class of hotel services, La

24  Quinta has a famous mark.

25      So the argument that they are not competing with us

because their room rates might be higher than ours in some places simply misses the point. The point is that when presented with the Quinta Real name, this is what actually happened in both surveys, the survey that we did, Mr. Johnson submitted, and the survey that their expert did: Quote, "It sounds like a higher quality resort or hotel based off of La Quinta." "It automatically makes me think of a La Quinta Inn." "Is it a fancier hotel owned by La Quinta?" "Must be part of the chain because of the use of the word 'Quinta.'" And in their survey, quote, "Must be an upgraded version of La Quinta." So the argument that because they're more expensive that people are going to automatically somehow know that they are not affiliated with us, that's reality.

When people were presented with the word mark "Quinta Real" in this state and asked, "This is the name of a hotel which you may or may not be familiar with; who puts this out?" in our survey, 29 percent of people, nearly one out of three, said either La Quinta –– they volunteered La Quinta, must be La Quinta; or when they were asked "Does this chain have any other locations?" they could give addresses of La Quinta properties. So the argument that there's absolutely no likelihood of confusion is simply baseless.

In fact, the Ninth Circuit has held in a case which I can give the full cite to, the *Thane* case, *Thane International, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, in 2002, that a

1  lower percentage than is present in this case is sufficient to

2  automatically defeat a defendant's motion for summary judgment

3  that there's no likelihood of confusion regardless of

4  methodological criticisms.

5      So as we sit here, the defendant is arguing that there's

6  no question of fact and this Court, even in the light most

7  favorable to La Quinta, should say that these

8  verbatims-in-29-percent survey, confusion in our survey,

9  nonetheless there's no likelihood of confusion, is completely

10  off base.

11      What my adversary does frequently -- and I'm sure Your

12  Honor having a great familiarity with these issues, what my

13  adversary frequently does is talk about contemporaneous use.

14  In fact, what really has gone on is they've existed in Mexico

15  and we've existed in the United States.

16          THE COURT:  Are you trying to keep them from existing

17  in Mexico, too?

18          MR. GIOCANDA:  Well, Your Honor, that's a very good

19  question, and there is actually something we submitted on

20  Friday to show that the Mexican situation is very much in

21  flux.  On Friday we submitted -- and I have here the

22  official -- from the Mexican government, the official decision

23  that held -- and I will read it, if I may, Your Honor.  This

24  is the Mexican court of appeals.

25      It considered, the lower court considered that the

confusion of the two trademarks, La Quinta and Quinta Real,
was derived from the similarity of the word "Quinta" contained
in both.  It was also determined that the identity of the
names and the products could cause confusion for the consumer,
especially because both provide the same products.

So the argument that there's no confusion in Mexico and
the parties have peacefully coexisted alongside one another is
simply not accurate.  The Mexican court of appeals in this
ruling had upheld the lower court's application -- rather, the
lower court's refusal to grant Quinta Real an application for
the name "Quinta Real" because we had a preexisting
registration for "La Quinta."  This was in the context, I
believe, of advertising and printed publications.

But the point is that it is not settled in Mexico.  It's
a different marketplace, it's a different language, and it has
different sets of facts and circumstances in Mexico.  And
according to, for example, this recent decision, there may
be issues relating to the coexistence of the parties in Mexico
with respect to their trademarks as decided here.

Now what the parties are doing in Mexico is they are to
some extent coexisting, but I believe that is an
ongoing issue.  The parties have not completely resolved their
Mexican issues.  As I said, this just came down recently.  So
it is our position that Mexico is irrelevant to this case.
Their Mexican activities do not give rise to some kind of

1   laches, because they can do what they're doing in Mexico as

2   they've been doing.  We have no opposition to that in this

3   case.  The opposition is opening a hotel --

4           THE COURT:  You did emphasize "in this case."

5           MR. GIOCANDA:  That's correct, Your Honor.

6           THE COURT:  I want to make sure the other side heard

7   that, because they may use that again in another proceeding in

8   Mexico.

9           MR. GIOCANDA:  Well, the parties reserve their rights

10  in Mexico and may litigate different issues in different

11  courts in Mexico.

12      This case relates to a single question, which is may

13  Quinta Real, who has never offered hotel services within the

14  geographical boundaries of the United States, rely upon its

15  activities solely in support of its foreign properties, may it

16  rely on that to get a foothold into the United States and then

17  argue, as Mr. Colucci just did, that it gives rise to

18  permissive -- that they're permitted to now expand and open

19  new properties in the United States.

20      But the law is very clear, Your Honor, under the *Grupo*

21  case and under very many other cases, *Kerzner*, which we cite,

22  the foreign rendering of services, whether they be hotel

23  services, casino services, and related activities in the

24  United States to promote those do not give rise to a use in

25  commerce within the United States such as to give Quinta Real

1  any rights here.

2      It is a newcomer, Your Honor, and as a newcomer to the

3  United States, the law differs.  As a newcomer, because they

4  have not offered any hotel services within the United

5  States -- the defendant's first property in Mexico opened

6  years after La Quinta was already famous in the U.S. for

7  hotels, and Quinta Real is, quote, "not well-known in the

8  U.S."  That's what their expert said.  Their expert said that,

9  that Quinta Real is not well-known in the United States, and I

10  think they agree with that, that that's true.  People may have

11  stayed in Quinta Real properties in Mexico, but they have not

12  offered any evidence to show that it is well-known in the

13  United States, and this is a key admission, Your Honor.

14      When asked at a 30(b)(6) deposition, "Couldn't the

15  defendant open a hotel in the United States under a different

16  name?" they said, "Yes."  And further we asked, "Would it in

17  any way prejudice the defendant?  Would it in any way make it

18  difficult for the defendant to open a hotel property in the

19  United States under a different name?"  Answer, "No."

20      No.  It's their preference.  They would like to do it,

21  and they would like to use the same name in the United States

22  they've used in Mexico, but just because they prefer it

23  doesn't change the fact that they are a newcomer into a

24  country where La Quinta has already established very strong

25  and well-established trademark rights.

1    Consequently, because they are a mere newcomer to the

2    United States, Your Honor, the cases treat them differently.

3    The cases now say the mere possibility of confusion puts them

4    at risk of an injunction because they will suffer no prejudice

5    or harm.  They just admitted it.  They can choose a different

6    name.

7        We are not trying to stop them from opening hotels in the

8    United States, Your Honor.  They can do that anywhere they

9    want and fairly compete, but they can't do it under the same

10   name they do it in Mexico because of confusion.  And the fact,

11   the undisputed fact that we have a survey in the record that

12   shows 29 percent and, I would add, Your Honor, the fact that

13   their own survey shows over 5-percent confusion, even with

14   their flawed methodology, their own survey shows 5 percent, on

15   those facts we would be prejudiced and they would not; and

16   therefore they cannot open in the United States under the name

17   Quinta Real.  That's what we believe, Your Honor, and we

18   believe that the law clearly supports that, and the facts in

19   the record clearly support that.

20       Now with respect to the trademark registration points

21   that Mr. Colucci brings up, the defect, the fatal defect in

22   the "QR" mark that we went on to seek to cancel, the fatal

23   defect is it relies, Your Honor, on the same flaw as the

24   defendant's argument here today.  They applied for the "QR"

25   mark and claimed that they had made use of the "QR" mark in

1  commerce with the United States as opposed to in the United

2  States.  It's the same flawed logic that they are attempting

3  to use to justify the registration and the ultimate use of the

4  Quinta Real trademark registrations.

5      So the problem with their logic is that they don't make a

6  distinction, Your Honor, but the law does.  There is trademark

7  use outside the United States in connection with those folks

8  in the U.S., and then there's trademark use in the U.S.  The

9  fatal defect in both their registration for "QR" and their

10  application that's before this Court, the fatal defect is the

11  coexistence problem.

12      It's what we just talked about.  It's that they conflate.

13  They would erase the territoriality distinction altogether,

14  they would erase the border, and they would say that

15  everything they have done in Mexico over the last 25 years is

16  the same as if they did it in downtown Tucson.  The law does

17  not mandate that result because the markets don't reflect

18  that.

19      So their point that there's been no actual confusion,

20  that's true because the parties are in two different

21  countries, two different destinations, completely different

22  consumers, completely different marketing channels.  So you

23  wouldn't expect there to be actual confusion, but it is very

24  different when you enter the United States and build a hotel a

25  mile away from a La Quinta property or, in fact, four La

1    Quinta properties.  So their argument that this lack of actual

2    confusion proves something, it simply proves nothing because

3    they have not, in fact, coexisted at any point within the

4    United States.

5         Now with respect to the specifics of the surveys, Your

6    Honor, if I may briefly, the Johnson survey, our expert's

7    survey, surveyed 306 individuals in six different areas of

8    Tucson and Phoenix, and they had to spend or intend to spend

9    $150 per night at a hotel.  This was our expert's decision,

10   and he chose that because he said -- and he testified about

11   this in his report -- that the average rate of La Quinta being

12   about $100 a night, 90 to $100 a night, and their average

13   being about 200, and he split the difference and said you have

14   to spend over 150 a night at a hotel.

15        So our expert said, "We are going to get people who may

16   never spend a night in a La Quinta.  That's okay.  Our goal is

17   not to tilt it.  It's to try to match the marketplace

18   conditions."  They were shown the Quinta Real name on a card,

19   and they were told this is the name of a hotel or resort.

20        Now the criticism of using a card as opposed to a

21   product, there are cases that criticize that.  The reason for

22   that criticism is when experts choose to use a card instead of

23   the actual product when it exists is problematic because the

24   argument is, well, you could have taken, in the *Juicy* case,

25   the lip gloss and you could have just changed the name on it.

1   And to put it on a card when you could have done that suggests

2   that you might be doing something untoward and tilting the

3   results away from what they may have seen if they saw the

4   product.

5       Here, none of that occurred.  There is no hotel in the

6   United States that we could show marketing materials for.

7   There is nothing in the United States that we could create.

8   If we created a mockup advertisement, they would say, "That's

9   not what our hotel would look like.  That's not the marketing

10  materials we intend to use."

11      So rather than use the Mexican materials, which is what

12  they did -- they showed the Mexican website with no reference

13  to the United States whatsoever.  They didn't even say to the

14  respondents this is the website of a Mexican chain that's

15  expanding into the U.S.  They just showed the Mexican website,

16  which was all about Mexico, and said, "Who puts this out?"

17  And they still got 5 percent, more than 5 percent said La

18  Quinta.

19      But the fact is, we said this is the name.  This is the

20  most common denominator that people are going to be exposed

21  to, whether it's in guide books, on the Internet, billboards,

22  hearing it verbally when people say, "I stayed at a Quinta

23  Real," hearing it on the radio.  In all kinds of advertising,

24  the most common denominator is not the logo.  It is not a

25  description of the hotel.  It's the name.  That's what we care

about, the name.  So we showed it to the respondents, and as I

said, 29 percent were confused.

Now in contrast, as I mentioned, the Mazis survey, the

Mazis survey used the Mexican website, did not isolate what's

at issue in this case.  We are not suing over the Mexican

website.  We are not suing over all the things they do in

Mexico in the United States.  They used the name.  That's what

we care about.  They did not isolate the name in their survey.

Instead, they forced each respondent to read five separate

detailed web pages on their Mexican website.

Further, even though they were going to build right here

in Tucson, they didn't test anyone in Tucson.  Instead, they

tested Albany, New York; Akron, Ohio; Brooklyn, New York.

They tested all these places and they showed them the Mexican

website and said, "Who puts this out?"  And like I said, 5

percent still said La Quinta.  But the fact that 95 percent

said "I don't know" or "Quinta Real puts it out" is not all

that surprising given that there was no filter to determine if

any of these people were really in the market.

Further and lastly, the Mazis survey was admittedly

biased because in a PowerPoint presentation that we discovered

on his website, their expert, Professor Mazis, said to the

people he was giving a lecture to, who were actually lawyers,

the American Bar Association, he said, "Be wary of using the

Internet filter because it's biased."  In other words, if you

1  only include respondents who use the Internet to search for

2  hotels, you are going to get an upscale bias because not

3  everyone does that.  Certainly a lot of people do, but a lot

4  of people still rely on travel agents, word of mouth, or guide

5  books or a variety of other mechanisms.  So it was an

6  admittedly biased result, but Professor Mazis did it anyway.

7      So it's our position, Your Honor, that given all of this

8  record, given these facts, and given the record that's not in

9  dispute in this case, there can be no question that there

10 would be a likelihood of confusion if the defendant were to

11 open a hotel in the United States that uses any variant of the

12 name "Quinta Real."  As I said, that's the injunction we are

13 seeking.  They can open a hotel under a different name.

14 They've always been welcome to open a hotel under a different

15 name.  That's not what they want to do.  It's not their

16 preference.  That's their business plan.  That's their goal,

17 and they have attempted to do it.

18     We have brought the lawsuit timely.  We didn't delay at

19 all.  And as Your Honor pointed out, if we had waited, they

20 would have said we are laches there because we should have

21 sued them and given them the notice that was required.  We

22 sued them the first instance when it appeared in two separate

23 newspaper articles that they had signed a formal contract to

24 begin investing in a property in the United States that would

25 be called Quinta Real.

1    So we did our survey first.  We didn't file litigation

2  and then do a survey after to back it up.  We did the survey

3  first to see if there was, in fact, a likelihood of confusion;

4  and when there was 29 percent, we had no choice but to bring

5  this lawsuit.  We could not allow them to open hotel

6  properties all around the United States in proximity to La

7  Quinta properties without bringing this to the Court for an

8  injunction, and that's the reason we are here.

9    It's not a question of laches.  Did we delay?  We brought

10 suit at the first instance when it was appropriate.  We gave

11 them an opportunity to see the survey when we filed the case.

12 We didn't withhold the survey until discovery.  We attached it

13 to the complaint.  We said, "This is the survey we have."  And

14 they waited until late in the litigation to hire an expert and

15 then do what they call a rebuttal survey.  But as I said, Your

16 Honor, their survey is so irrelevant to this case that it

17 can't, it simply can't present a genuine issue of material

18 fact to our survey expert.  As I said, the case law is clear

19 that they cannot defeat summary judgment by merely criticizing

20 our survey methodology.

21    So, Your Honor, in essence, we believe that an injunction

22 at this time would be in the best interest of both sides so

23 that they can go about their plans of building a hotel under a

24 different name, and that would be, on the balance of equities,

25 the appropriate result.

```
1              THE COURT:  I have one question not related to what
2    you have argued so far.  Didn't your CEO go on Undercover Boss
3    not that long ago?
4              MR. GIOCANDA:  Is that possible?  Did our CEO go on
5    Undercover Boss?
6              MS. FULLER:  Oh, I don't know.  I don't think so, no.
7              THE COURT:  I'm almost positive.
8              MR. GIOCANDA:  I'm not familiar with that fact, Your
9    Honor.
10             MS. FULLER:  I'm not sure about that.
11             MR. GIOCANDA:  I'll certainly look into that.
12             THE COURT:  You don't have to get back to me with an
13   answer.
14             MR. GIOCANDA:  Okay.
15             THE COURT:  Thank you.
16        A couple of minutes.
17             MR. COLUCCI:  Thank you, Your Honor.
18        So there's no hotel here.  There's one that was at least
19   intended back in 2007 to be developed and operated.  That's
20   been abandoned.  And they want a nationwide, permanent
21   injunction from us ever opening a hotel anywhere in the United
22   States no matter what it looks like, what its rates are, or
23   anything about it.
24             THE COURT:  They only care about what it's called.
25             MR. COLUCCI:  I understand that, but as long as it's
```

1 not called Quinta Real.

2          THE COURT:  Yeah.  They said, "Build any hotel you

3 want.  Just don't call it Quinta Real."

4          MR. COLUCCI:  In the meantime, everything that they

5 have presented, I would think that we have to assume right now

6 that all of the use that has gone on for 25 years in Mexico,

7 where they have hotels, both of them --

8          THE COURT:  Yeah, but in Mexico people understand the

9 difference between "La Quinta" and "Quinta Real," don't they?

10 There's clearly a difference.  They mean two different things.

11          MR. COLUCCI:  They mean two different things right

12 here in the United States as well.

13          THE COURT:  Yeah, but we don't speak Spanish that

14 well.

15          MR. COLUCCI:  With the large Latin population that we

16 have here, I'm sure they know that.

17      Anyway, for 25 years they're both operating hotels, the

18 same hotels that they claim are going to be built here in the

19 United States, take a completely inconsistent position.  In

20 fact, the evidence in there is one of their representatives,

21 the director of franchise operations in Mexico, contacted the

22 chairman of our Quinta Real to help them develop franchises

23 for the La Quintas in Mexico.  Now that seems to me to be

24 quite an inconsistent position to take.

25      And to try to suggest to this Court that the use of the

Quinta Real trademarks in Mexico are somehow in flux or in limbo somewhere is ridiculous. We've been using these and they have been using them. We have not taken any action against them. They have taken a completely inconsistent position.

Now come back to the United States. They are saying we haven't used anything in commerce because we don't have a hotel, but what is it that we've been doing for 25 years in the United States? We've built up a reputation and the goodwill of our trademark. Sure, we don't have a hotel. And what do they do? They don't do anything. So are we to assume, therefore, that everything that we've done in the United States and in Mexico is not likely to cause confusion with them? If we assume that, then we have to look at it, would that change if we were to build a hotel in the United States and, if so, where and under what circumstances?

They're telling us that, you know, we are infringing. They've got the survey. I mean, if a survey is flawed because of its methodology or because of the questions it asks, it's thrown out the window. It has no bearing. You can't go into a survey that has not met the requirements of admissibility in court and then try to take out of it what you want.

The survey that we conducted was using some information so that it has some contextual information, so when the person is going on the Internet -- and most people when they are

1  making reservations do do that -- that it makes sense.  And he

2  can't take our survey which shows 5 percent and say, "Well,

3  that benefits us."  Anything under 10 percent, the court says,

4  shows no evidence of likelihood of confusion.

5      His survey is out.  There's no way that he can have his

6  survey in under any circumstances.  And if we look at the very

7  case that the Court mentioned that the survey expert was

8  involved in, which was the *Juicy Couture* case against *L'Oreal*,

9  the court said, "Essentially, the survey was a word

10 association test, in which respondents were shown a card with

11 the word 'Juicy' and repeatedly asked questions in which the

12 word 'Juicy' appeared."

13     "Surveys which do nothing more than demonstrate the

14 respondents' ability to read are not probative on the issue of

15 likelihood of confusion."

16     And then in another case where the survey expert was

17 involved, "The survey establishes no more than that the names

18 are similar, a factor as to which there can be little genuine

19 dispute in any event, and that portions of the general public

20 will make the reasonable assumption that, in the absence of

21 any other information, two companies with similar names are

22 likely to have a business connection.  However, this

23 proposition provides no indication of public reaction under

24 actual marketplace conditions, and we conclude that there is

25 no meaningful evidence of actual confusion."  That's the

1  *Franklin Resources* case where he was involved in.

2       What clearer information that his survey is no good?  He

3  has no evidence of any likelihood of confusion.  In fact, what

4  we have is evidence of the contrary.  Sure, we don't have a

5  hotel, but everything that we've done for the last 20, 25

6  years here they have not objected to.  There's no evidence of

7  actual confusion, and they have not established why now, if we

8  build a hotel in the United States and call it Quinta Real,

9  there's suddenly going to be confusion.

10      And he's talking about rates.  The rates that he is

11 talking about, the average rates are Mexican hotels.  They are

12 less expensive than the U.S. hotels.  If we were to build a

13 hotel in the United States, depending upon the location, our

14 rates would be on par with the Ritz Carlton, Four Seasons, way

15 up in the sky; and they would be nowhere near that even with

16 their fancy amenities or whatever they are claiming.

17      We are coming into the United States.  We are not going

18 to be building some motel or hotel.  We are building something

19 that we think demonstrates the quality and the goodwill that

20 we have built up in this country.  Now if you don't want to

21 call it use in commerce, don't call it use in commerce.  I

22 don't care what he calls it, but it is use and has been going

23 on for 25 years, and we are entitled to the value of that if

24 we want to come into the United States to build a hotel and

25 call it Quinta Real.

1    He has not demonstrated any basis on which he should be

2  entitled to a permanent, nationwide injunction against our

3  doing so, and I believe that any attempt to do that is

4  strictly premature on their part.

5          THE COURT:  Thank you.

6    Any last remarks?  I said it would just be twice.

7          MR. GIOCANDA:  Just one very quick point, Your Honor,

8  which is there's no basis to say that there's use and then

9  there's use in commerce.  If, in fact, the courts have held

10  the territoriality principles to mean anything, it's that

11  rendering services or selling products within the boundaries

12  of the United States is what gives rise to trademark rights

13  and, therefore, use.

14    In this case it is clear, the facts are not in dispute,

15  that they have had hotels in Mexico.  They may have done some

16  advertising in the United States.  However, and I would point

17  Your Honor to the *Kerzner* decision in which the Atlantis

18  casino in the Bahamas, with frankly far more advertising and

19  promotion in the United States than Quinta Real does, was

20  found by another sister court in this district to be simply

21  inadequate to constitute use in commerce in the United States

22  sufficient to confer any rights whatsoever.

23    So the argument that there's use versus use in commerce,

24  that's simply not based in the case law.  There's use in

25  commerce or not, and the fact is, within the United States,

1  they are a newcomer because they have not made any use in

2  commerce and, therefore, have to avoid any possibility of

3  confusion.

4      The surveys:  Despite their criticism of methodology, the

5  surveys are clear.  There is some evidence of likelihood of

6  confusion.  We believe, Your Honor, on the case law, that's

7  all we need to show to justify an injunction against them

8  building a hotel that uses the name Quinta Real.  As Your

9  Honor pointed out, they are free to build a hotel and fairly

10 compete with us and everyone else, but they can't cause

11 confusion in doing so.  Thank you, Your Honor.

12         THE COURT:  Thank you.  I'll take the matter under

13 advisement.

14         MR. COLUCCI:  Your Honor, may I?

15         THE COURT:  You both got to speak twice.  That's it.

16 Thank you.

17      (Court recessed at 3:45 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, Aaron H. LaDuke, do hereby certify that I

3    reported the foregoing proceedings to the best of my skill and

4    ability, and that the same was transcribed by me via

5    computer-aided transcription, and that the foregoing pages

6    of typewritten matter are a true, correct and complete

7    transcript of all the proceedings had, as set forth in the

8    title page hereto.

9              Dated this 2nd day of February, 2011.

10

11

12              _____s/Aaron H. LaDuke_____
                  Aaron H. LaDuke, RMR, CRR
13                Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25