IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| La Quinta Worldwide, LLC,<br><br>    Plaintiff,<br><br>vs.<br><br>Q.R.T.M, S.A. de C.V.,<br><br>    Defendant. | No. CV 09-175-TUC-RCC<br><br>**ORDER** |

This case involves a dispute between La Quinta Worldwide (La Quinta) and Q.R.T.M. (Quinta Real) over whether Quinta Real's plans to expand its chain of resorts and spas into the United States would infringe any of La Quinta's registered trademarks. La Quinta's complaint sounds in federal trademark infringement, federal unfair competition, federal trademark dilution, common law unfair competition and seeks cancellation of Quinta Real's federal trademark registration, injunctive relief, accounting and damages, and attorney's fees and costs. Quinta Real's cross-complaint seeks a declaratory judgment of non-infringement and attorney's fees.

The parties filed cross-motions for summary judgment on July 20, 2010. (Docs. 65 & 67). In addition to their motions for summary judgment, the parties request that the Court settle an evidentiary dispute. The parties both filed addition statements of facts with their respective replies, and each party challenges the other's right to do so and asks that the Court

1 strike those additional statements of fact from the record. (Docs. 82 & 87). La Quinta also
2 filed a request for judicial notice of a decision of a foreign court, which Quinta Real opposes.
3 (Doc. 93, 98 & 100). The Court held oral arguments on the motions for summary judgment
4 on January 24, 2011, and all motions are now fully briefed and ready for ruling.

5       Both hotel chains have been in existence for several decades, but have existed in
6 separate spheres. (Doc. 66, ¶¶ 1-3; Doc. 68, ¶¶ 6-7). La Quinta operated hotels in the United
7 States, and Quinta Real did the same in Mexico. (Doc. 66, ¶ 2; Doc. 68, ¶ 7). This litigation
8 arose when Quinta Real made its second attempt to enter the American market and executed
9 a letter of intent regarding a new a hotel in Tucson, Arizona. (Doc. 1, ¶ 14; Doc. 66, ¶¶ 36-
10 39).

11 **MOTIONS FOR SUMMARY JUDGMENT**

12       Summary judgment is appropriate when the undisputed material facts, taken in a
13 light more favorable to the non-moving party, demonstrate the moving party is entitled to
14 judgment in its favor as a matter of law. Anderson v. Liberty Lobby Inc., 477 U.S. 242,
15 106 S. Ct. 2505 (1986). Summary judgment must be granted if party responding to the
16 motion fails "to make a sufficient showing on an essential element of her case with
17 respect to which she has the burden of proof." Celtox Corp. v. Catrett, 477 U.S. 317, 325,
18 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When moving party does not bear the burden of
19 proof, summary judgment is warranted by demonstration of an absence of facts to support
20 non moving party's case. Id. at 325.

21 *Claims Relating to Trademark Infringement*

22       Summary judgment can be granted in a trademark case following the usual standard.
23 Surfvivor Media, Inc. v. Survivor Productions, 406 F.3d 625, 630 (9th Cir. 2005). However,
24 the practice is disfavored because it requires an intense parsing of the facts. KP Permanent
25 Make-Up, Inc. v. Lasting Impression I, Inc., 408 F.3d 596, 602 (9th Cir. 2005); Thane
26 Internat'l, Inc. v. Trek Bicycle Corp., 305 F.3d 894, 901-02 (9th Cir. 2002) (*superceded by*
27 *statute on other grounds*, Levi Strauss & Co. v. Abercrombie & Fitch Trading Co., – F.3d
28 –, 2011 WL 383972 (9th Cir. 2011)) ("...a careful assessment of the pertinent factors that go

1  into determining likelihood of confusion usually requires a full record"). A motion for

2  summary judgment in a trademark infringement case where the sole issue is likelihood of

3  confusion may only be granted where (1) the evidence is completely one-sided, Lorillard

4  Tobacco Co. v. Division & Noble Amoco Corp., 390 F.Supp.2d 678, 682-83 (N.D.Ill.,2005)

5  (citing CAE, Inc. v. Clean Air Engineering, Inc., 267 F.3d 660, 677 (7th Cir. 2001)), or (2)

6  the marks are totally dissimilar, Chesebrough-Pond's, Inc. v. Faberge, Inc., 666 F.2d 393,

7  398-99 (9th Cir. 1982).

8   The Lanham Act provides that:

9/10/11/12  "Any person who shall, without the consent of the registrant – (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive...shall be held liable in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C.A. § 1114 (1)(a).

13/14  A plaintiff must prove that it has a protected mark and that the alleged infringer's

15  mark is similar enough to cause confusion or mistake, or to deceive. American Circuit

16  Breaker Corp. v. Oregon Breakers, Inc., 406 F.3d 577 (9th Cir. 2005). With regards to proof

17  of a protected mark, registration on the principle register is prima facie evidence of

18  ownership of the mark and an exclusive right to its use, 15 U.S.C.A. § 1115(a), and creates

19  a "strong presumption of validity." Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1254

20  (9th Cir. 1982). Once a mark becomes incontestable under 15 U.S.C.A. § 1065, registration

21  is conclusive evidence of ownership of the mark and the exclusive right to its use. 15

22  U.S.C.A. § 1115(b). An incontestable mark may only be challenged according to the

23  enumerated defenses and defects set out in 15 U.S.C.A. § 1115(b)(1)-(9). A conclusive

24  presumption of secondary meaning applies to descriptive marks that have achieved

25  incontestable status, and incontestable status applies to the mark and all its parts. KP

26  Permanent Make-Up 408 F.3d at 606.

27  Neither party disputes that La Quinta has protectable trademarks. There is a dispute

28  over whether the marks are incontestable. (Doc. 71, Resp. ¶ 29; Doc. 68, ¶ 29).

- 3 -

1  With regards to the likelihood of confusion caused by the allegedly infringing mark, 2 the test is "whether a "reasonably prudent consumer" in the marketplace is likely to be 3 confused as to the origin of the good or service bearing one of the marks", <u>Dreamwerks</u> 4 <u>Production Group, Inc. v. SKG Studio</u>, 142 F.3d 1127, 1129 (9th Cir. 1998). This is assessed 5 using an eight-factor test laid out in <u>AMF Inc. v. Sleekcraft Boats (Sleekcraft)</u>, 599 F.2d 341 6 (9th Cir. 1979) (*abrogated on other grounds by* <u>Mattel, Inc. v. Walking Mountain</u> 7 <u>Productions</u>, 353 F.3d 792 (9th Cir. 2003). Those factors are: (1) strength of the mark, (2) 8 proximity of the goods, (3) similarity of the marks, (4) evidence of actual confusion, (5) 9 marketing channels, (6) type of goods and purchaser care, (7) intent, and (8) likelihood of 10 expansion. Depending on the facts of the case, certain factors are more important than 11 others, and the factors should not be treated as a scorecard. <u>KP Permanent Make-Up</u>, 408 12 F.3d at 608; <u>Thane</u>, 305 F.3d at 901. Finally, there are two theories of confusion that may 13 be put forth. Forward confusion happens when the junior users mark is mistaken for the 14 senior mark. <u>M2 Software</u>, 421 F.3d at 1079; <u>Dreamwerks</u>, 142 F.3d at 1130 n. 5; <u>Surfvivor</u>, 15 406 F.3d at 630. Reverse confusion occurs when the senior mark is mistaken for the junior 16 mark. <u>M2 Software,</u> 421 F.3d at 1079; <u>Surfvivor</u>, 406 F.3d at 630. La Quinta has not 17 identified which theory it is pursuing.

18  The strength of a mark is assessed along a continuum (arbitrary, fanciful, suggestive, 19 descriptive, or generic), and the stronger the mark, the wider the reach of protection from 20 infringement. <u>M2 Software</u>, 421 F.3d at 1080; <u>Surfvivor.</u>, 406 F.3d at 631-32; <u>Sleekcraft</u>, 21 599 F.2d at 349. A mark's strength can be enhanced by the owner's marketing efforts, or it's 22 commercial success.  <u>M2 Software</u>, 421 F.3d at 1081;  <u>Sleekcraft</u>, 599 F.2d at 350.

23  Since both forward and reverse confusion are possible here, the Court will analyze the 24 strength of both marks at issue. La Quinta's mark is strong, because it is a suggestive mark 25 with a strong advertising budget and commercial success behind it. A suggestive mark is one 26 that suggests, but does not describe, the product. <u>Surfvivor</u>, 406 F.3d at 632. "La Quinta" 27 means "country house", which is evocative of a hotel or inn.  (Doc. 66, ¶ 7). La Quinta 28 presently owns, operates, or franchises 800 hotels in the United States.  (Doc. 68, ¶ 7). In

1  2008 and 2009, it generated $35 million in royalty fees, and in 2008 it had total revenues of
2  $50 million. (Doc. 68-1, ¶¶ 20-21). From 2007-2010, La Quinta devoted $100 million to
3  advertising and marketing. (Id. at ¶ 34).

4  Quinta Real's mark is also strong, because it is suggestive and is enhanced by its
5  commercial success and advertising budget. "Quinta Real" means "royal villa" and is
6  evocative in the same way as "La Quinta" of an inn or hotel. (Doc. 66, ¶ 6). Quinta Real
7  partners with various third party travel promoters to promote its Mexican hotels in the United
8  States and has been rewarded with favorable coverage in various travel and lifestyle
9  magazines. (Id. at ¶¶ 20-23 & 26-31). Because both marks are strong, this factor weights
10 in favor of La Quinta. See Surfvivor, 406 F.3d at 632.

11 When assessing the next factor, proximity of the goods, courts look to whether the
12 goods are (1) complementary, (2) sold to the same class of purchasers, or (3) similar in use
13 and function. Sleekcraft, 599 F.2d at 349. The inquiry focuses on whether customers are
14 likely to associate the two product lines, Dreamwerks, 142 F.3d at 1131, or reasonably
15 conclude that the products came from the same source. Sleekcraft, 599 F.2d at 348 n. 10.
16 Put another way, "the courts assess whether the goods are related or complementary. M2
17 Software, 421 F.3d at 1081-82.

18 This factor also weighs in La Quinta's favor. Even if the Court were to accept Quinta
19 Real's assurances that it is a luxury hotel with services and amenities far and above those of
20 La Quinta, the fact that their rates, even now, overlap undercuts this argument. (Doc. 66-2,
21 p. 6-9, 12, & 41). The rate overlap combined with the diversity within La Quinta's hotel
22 chain could lead consumers to associate the two chains, because both use the word "Quinta",
23 both provide lodging, and some room rates overlap. (Doc. 68, ¶¶ 15-17). Add in the Ninth
24 Circuit's reluctance to accept such niche market arguments, as evidenced by the Court's
25 rejection of such an argument in Sleekcraft, 599 F.2d at 348, which found that the distinction
26 between family boat and racing boat market not enough to preclude finding that uses overlap,
27 and this argument falls flat. Both La Quinta and Quinta Real offer hotel and motel services
28 to consumers at overlapping rates, and Quinta Real's attempt to distinguish its services by

1 placing them in a niche luxury market is to no avail.

2 Mark similarity, the next factor, is assessed viewing each mark in its entirety as it is
3 presented in the marketplace and comparing the marks for similarity in sight, sound, and
4 meaning. M2 Software, 421 F.3d at 1082; Surfvivor, 406 F.3d at 633; Sleekcraft, 599 F.2d
5 at 351. Similarities weigh more heavily than differences. Sleekcraft, 599 F.2d at 351. This
6 factor is neutral.

7 The marks submitted by La Quinta for the Court's consideration all contain the phrase
8 "La Quinta" but in varying typefaces and accompanied by other words underneath the
9 phrase, such as "suites", "returns", "inn" and "inn & suites". The phrase generally appears
10 with a logo, but that logo is not consistent. Of the eight trademarks submitted, six appear
11 with the outline of a sign, one is the phrase alone, one is the phrase with the sunburst, and
12 one is the phrase inside an oval. Quinta Real's trademark includes the letters Q and R inside
13 concentric ovals with the phrase "Quinta Real" underneath, followed by five stars, a line, and
14 the phrase "grand class hotels and resorts".

15 As a whole, the logos are not similar looking, but when the Court looks to the only
16 consistent portion of La Quinta's design - the phrase "La Quinta" and compares it with
17 Quinta Real's design, there are some similarities, the most important of which is the
18 treatment of the word "Quinta". Both parties treat the word as a separate word, and
19 capitalize it. The logos are moderately similar sounding. Both involve the dominant word
20 "Quinta" and the only difference in sound is that "Quinta" is followed by the two syllable
21 "Real" in one instance and prefaced by the one syllable "La" in the other. Finally, the
22 meanings are very close. Both are variations on the Spanish word for house or home, with
23 the only difference being the level of luxury. One is "royal" and the other is "country".
24 Taking sight, sound, and meaning together, it is possible for reasonable people to differ on
25 whether or not the marks are similar.

26 The fourth factor - evidence of actual confusion - weighs in neither parties favor.
27 Evidence of actual confusion is very persuasive but hard to come by. Sleekcraft, 599 F.2d
28 at 352. Since such evidence is hard to come by, it is dispositive only when there is evidence

1  of confusion or no evidence when the circumstances indicate that it should have been
2  available. Id. at 353. "Survey evidence may establish actual confusion." Thane, 305 F.3d
3  at 902.

4    Neither party contends that they have encountered any confused hotel guests as a
5  result of the similar trademarks, and both rely on surveys conducted by experts. Both also
6  object to each other's surveys and expert reports. The main difference between the two
7  surveys are the stimulus used and population sampled. La Quinta's expert showed survey
8  respondents two printed cards with "Quinta Real" on one and a control phrase, "Costa Real",
9  on the other. (Doc. 68-11, p. 6). He conducted his survey exclusively in Tucson and
10 Phoenix. (Id.). Quinta Real's expert walked survey respondents through five screen shots
11 of its website, and conducted his survey in various cities throughout the United States, but
12 none in Arizona. (Doc. 66-4, p. 10).

13   So long as a survey is relevant to the issue at hand and conducted according to
14 accepted principles, challenges to methodology go to weight and not admissibility. Wendt
15 v. Host International, Inc., 125 F.3d 806, 814 (9th Cir. 1997). Here, neither survey has any
16 value with respect to the issue of actual confusion, and both should be excluded as irrelevant.
17 La Quinta's survey did not measure consumer confusion when confronted with Quinta Real's
18 trademark, because the trademark was not included in the survey.

19   Quinta Real's survey did not measure actual confusion when confronted with the
20 trademark, because it presented survey respondents with information far beyond the mark.
21 Consumers who are not necessarily looking for a luxury resort and spa may happen upon
22 Quinta Real at a third party site such as Travelocity.com and not ever visit Quinta Real's site.
23 Therefor, for the survey to be relevant to the issues at hand, it needed to measure the potential
24 for consumer confusion when presented with the trademark as it appears in the marketplace.

25   The absence of a properly conducted survey is troubling, but not dispositive. If either
26 party had been able to produce a survey or other evidence of actual confusion, that evidence
27 would weigh strongly in favor of a finding of a likelihood of confusion. Their failure to do
28 so does not lead directly to the conclusion that there is no likelihood of confusion. Therefore,

1  this factor weighs in neither party's favor.

2  As to the next factor, overlap of marketing channels overlap, courts look to where the
3  products are sold, the sales methods employed, the price ranges, the type and amount of
4  publicity via magazines, trade shows, newspapers, and telephone directories, and the class
5  of purchasers exposed to the marketing efforts.  Sleekcraft, 599 F.2d at 353.

6  While La Quinta and Quinta Real do use varying marketing techniques, their efforts
7  converge with third-party internet travel sites and guidebooks. (Doc. 66, ¶ 2-25; Doc.68-1,
8  p. 8). This convergence weighs in favor of La Quinta. Those who view Travelocity.com,
9  for instance, might encounter one or both marks on that site, and confusion could result.
10 This is so even considering the ability limit hotel searches and results by price range and
11 various amenities, because the rates of both chains overlap.

12 The overlap in marketing channels contributes to the consumer care factor. The
13 degree of consumer care is assessed using the "typical buyer exercising ordinary caution."
14 Sleekcraft, 599 F.2d at 353. This standard includes "the ignorant and credulous", excludes
15 "the wholly indifferent", and rises or falls depending on the typical expertise of the buyer and
16 the cost of the goods, Id., and, in the end, is based on "whether a 'reasonably prudent
17 consumer' would take the time to distinguish between the two product lines." Surfvivor, 406
18 F.3d at 634.

19 While Quinta Real could be correct that its hotel guests thoroughly research before
20 making a reservation, this only lessens the likelihood of reverse confusion - that La Quinta
21 will be mistaken for Quinta Real. However, the degree of care exhibited by people looking
22 to stay at a mid-tier hotel is much less, and given both parties presence on third-party internet
23 sites, it is entirely possible for a consumer to make a reservation based only on location and
24 price without any further research. Since some rates overlap between the two chains, it is
25 possible that a consumer could book one of Quinta Real's lower priced rooms fully believing
26 that he will be staying at a La Quinta hotel.

27 The next factor, whether or not either chain will expand into the other's territory in
28 the near future, is hard to evaluate in this case. The likelihood of expansion factor is used

1  to assess whether either party will expand his business to compete with the other. Id. Where
2  there is a "strong possibility" that this will happen, confusion will be more likely because
3  direct competition will be more likely. E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d
4  1280, 1293 (9th Cir. 1992); Sleekcraft, 599 F.2d at 354.

5  La Quinta states that it plans to open over 200 hotels in the coming years, but does not
6  provide any concrete details. (Doc. 68, ¶¶ 50-51; Doc. 68-1, p. 7). Quinta Real's attempts
7  to expand into the United States are the entire reason for this lawsuit, but it is unclear where
8  they hope to build. (Doc. 66-3, p. 2). While La Quinta is certainly a nationwide chain, there
9  is not a La Quinta hotel in every state. (Doc. 68, ¶ 7). Since this factor requires a strong
10 showing, it does not weigh in either parties' favor.

11 Finally, intent of Quinta Real does not weigh in either parties' favor. "When the
12 alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that
13 the defendant can accomplish his purpose: that is, that the public will be deceived."
14 Sleekcraft, 599 F.2d at 354 (citations omitted). When there is evidence that the similar mark
15 was adopted with intent to cause confusion, all inferences regarding the likelihood of
16 confusion are resolved against the alleged infringer. Sally Beauty Co., Inc. v. Beautyco, Inc.,
17 304 F.3d 964, 973 (10th Cir. 2002). While bad intent can have consequences for the alleged
18 infringer, good faith is only considered when the court fashions a remedy. Sleekcraft, 599
19 F.2d at 354.

20 While Quinta Real certainly had knowledge of La Quinta's trademarks prior to
21 registering its mark, this is not enough. Quinta Real never built a hotel under its trademark
22 in the United States and has pursued registration and its counter-claim for non-infringement
23 in an effort to clarify the status of the two trademarks. Since La Quinta has shown only that
24 Quinta Real had knowledge of La Quinta's trademark but not bad intent, this factor does not
25 weigh in its favor.

26 Weighing all of the factors, it appears that summary judgment for either party is not
27 appropriate at this time. While half of the factors tend to support La Quinta's position, the
28 two most important factors - similarity of marks and evidence of actual confusion - are

neutral at this point. The factually intensive nature of weighing the Sleekcraft factors generally relegates against summary judgment on claims of trademark infringement, and in this case, the facts are such that reasonable minds could differ. Therefore, the Court will deny La Quinta's motion for summary judgment on its claim of trademark infringement, and Quinta Real's motion for summary judgment on its claim for declaration of non-infringement.

## *Unfair Competition*

Federal claims of unfair competition fall within 15 U.S.C.A. § 1125(a). Under the statute, "[t]he 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'" Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1178 (9th Cir. 1988) (quoting New West Corp. v. NYM Co. of California, 595 F.2d 1194, 1201 (9th Cir. 1979)). Common law unfair competition mirrors this standard. Accuride Intern., Inc. v. Accuride Corp., 871 F.2d 1531, 1538 n. 7 (9th Cir. 1989). As discussed above, there is a genuine issue of material fact as to whether there is a likelihood of confusion between the contested marks. Therefore, summary judgment on La Quinta's unfair competition claims, both common law and federal, is not appropriate.

## *Trademark Dilution*

The federal trademark anti-dilution act protects "[t]he owner of a famous mark...against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c).[1]

To be "famous" in this context, a trademark must have "such powerful consumer associations that even non-competing uses can impinge their value." Thane, 305 F.3d at 908 (quoting Avery Dennison Corp. v. Sumpton, 189 F.3d 868, 875 (9th Cir. 1999)). It is possible to be famous within a niche market, but protection from dilution in that context

---

[1] There are three statutory exemptions, none of which apply here.

- 10 -

is limited to "when a mark is famous within a niche market *and* the alleged diluter uses the mark within that niche." Thane, 305 F.3d at 908.

Another limitation of this cause of action is the level of certainty of confusion. The plaintiff must establish actual dilution, which is a reduction in the famous mark's ability to identify the goods with its owner. Moseley v. V Secret Catalogue, Inc., 537 U.S. 418, 433, 123 S,Ct, 1115, 1124 (2003). This is separate and distinct from "likelihood of confusion" in that proof of actual dilution is absolutely required. Id.

In its motion for summary judgment, La Quinta offers only its arguments as to likelihood of confusion already set out above, its flawed survey, and a conclusory statement that Quinta Real's use of its mark is likely to lessen its trademarks' "ability to distinguish the Plaintiff's services." It offers no evidence that its product is so famous that a non-competing use - such as a La Quinta dog grooming service - would dilute its value. Its flawed survey does nothing to prove actual confusion since it fails to measure the trademarks as they are presented in the marketplace. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. Plaintiff's complete failure to argue or provide evidence in support of this claim makes summary judgment in favor of Quinta Real appropriate.

### *Laches*

In order to prove the defense of laches in a trademark infringement case, the defendant must demonstrate that the plaintiff failed to defend against infringement of its trademark for a significant period of time such that the plaintiff is foreclosed from claiming that defendant's use is an infringement. Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n, 465 F.3d 1102, 1108 (9th Cir. 2006). After determining the relevant statute of limitations, the Court must then balance six factors to determine whether any delay was unreasonable. Id. These factors are: (1) strength and

1  value of rights asserted, (2) diligence in enforcing mark, (3) harm to senior user if relief is
2  denied, (4) good faith ignorance by junior user, (5) competition between the two users,
3  and (6) extent of harm suffered by junior user.  Id.
4       Whether or not the statute of limitations has run in this case is the crux of the issue.
5  It is clear that Quinta Real's actions prior to the San Antonio project did not give rise to a
6  cause of action, since Quinta Real was engaged solely in advertising and booking
7  reservations from the United States without a physical presence in the United States and,
8  therefore, was not "in commerce".  Kerzner Intern. Ltd. v. Monarch Casino & Resort, Inc.,
9  675 F.Supp.2d 1029 (D.Nev. 2009);  Guantanamera Cigar Co. v. Corporacion Habanos,
10 S.A., 672 F.Supp.2d 106 (D.D.C. 2009).  Quinta Real has failed to substantiate its claim
11 that La Quinta knew or should have known about its San Antonio project.  Specifically,
12 La Quinta disputes any knowledge that the proposed hotel would include the word
13 "Quinta", and, in response, Quinta Real offers only news articles naming Quinta Real as
14 one of the developers.  This results in a genuine issue of material fact as to whether La
15 Quinta acquired a cause of action prior to the Tucson project and precludes summary
16 judgment.

### *Cancellation of Quinta Real's Mark*

18      A party may seek cancellation of a trademark based on certain enumerated grounds
19 if he believes he is or will be damaged by registration of the mark.  15 U.S.C.A. § 1064.
20 La Quinta seeks cancellation of Quinta Real's trademark for its failure to use the mark "in
21 commerce".  This request is not appropriate for summary judgment, because resolution at
22 trial of La Quinta's trademark infringement and dilution claims will determine whether or
23 not La Quinta is a party who may be damaged within the meaning of the statute.  Further,
24 failure to use a mark in commerce is not one of the enumerated grounds for cancellation.
25 La Quinta does not point to any other authority allowing cancellation of a mark by the
26 Court for this reason.

27          **OBJECTIONS TO STATEMENTS OF FACTS IN SUPPORT OF REPLY**
28      Both parties supported their cross-replies with Statements of Fact, and both parties

objected to this practice.  While submission of new evidence in a reply to a motion for summary judgment is generally disfavored, it is permissible where the new evidence is necessary to rebut allegations made in the response.  Miller v. Glenn Miller Productions, Inc, 454 F.3d 975, 978 n. 1 (9th Cir. 2006).  If the new evidence does not fall within this exception, "the district court should not consider the new evidence without giving the [non]-movant an opportunity to respond."  Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996) (quoting Black v. TIC Inv. Corp, 900 F.2d 112, 116 (7th Cir. 1990)).

The Court will strike both Statements in Support of Reply from the record.  Quinta Real's additional Statement of Facts is only nominally responsive to allegations in La Quinta's responsive brief, and La Quinta's additional Statement of Facts contains information that it could and should have submitted with its opening brief.  Neither party meets the standard for allowing supplemental statements of fact.

**REQUEST FOR JUDICIAL NOTICE OF A FOREIGN COURT DECISION**

Discovery in this case closed on June 1, 2010.  (Doc. 55).  La Quinta submitted a request for judicial notice on January 21, 2011, requesting that the Court take judicial notice of a decision of the Seventeenth Administrative Bench Court for the First Circuit of Mexico that issued on November 19, 2010 and published on November 29, 2010. Prior to this request, neither party gave any indication to the Court that there was any ongoing litigation in Mexico or elsewhere.

A court may take judicial notice of facts that are either (1) generally known within the court's jurisdiction, or (2) capable of ready and accurate determination through resources who accuracy cannot be reasonably questioned.  FRE 201(b).  The Court will deny the request to take judicial notice.  First, the Court is not in a position to interpret the submitted decision since it is based entirely on Mexican trademark law.   Second, it is unclear what relevance this document could have to the instant proceedings.  As La Quinta previously pointed out in its briefs, whether a trademark is registered or used in a foreign country is of no moment to trademark litigation in the United States because there are material differences in the trademark laws of other countries.  Third, the request is

1 untimely. Rule 44(2)(A(i) allows for proof of a foreign official record that is otherwise
2 admissible by submission of the official publication of the record.  The official
3 publication of this decision occurred on November 29, 2010, but La Quinta did not
4 submit its request until the Friday before Monday oral arguments, 54 days later.

5       Based on the reasons discussed above, judicial notice of the decision of the
6 Seventeenth Administrative Bench Court for the First Circuit of Mexico submitted by La
7 Quinta is inappropriate.

## CONCLUSION

9       Because there are genuine issues of material fact, as outlined above, the Court will
10 not grant summary judgment as to the claims relating to trademark infringement and
11 unfair competition, and Quinta Real's affirmative defense of laches.  Since La Quinta has
12 produced no evidence tending to prove its claim of trademark dilution and it bears the
13 burden of proof at trial, the Court will grant summary judgment for Quinta Real on this
14 claim.  The Court will strike the disputed Statements of Fact from the record, because
15 they are either irrelevant or untimely.  Finally, the Court refuses to take judicial notice of
16 the decision of the Mexican courts submitted by La Quinta.  Accordingly,

17       **IT IS ORDERED** denying La Quinta's Motion for Summary Judgment.  (Doc.
18 67).

19       **IT IS FURTHER ORDERED** granting in part and denying in part Quinta Real's
20 Motion for Summary Judgment.  (Doc. 65).  Summary judgment is granted in Quinta
21 Real's favor as to trademark dilution.  Summary judgment is denied as to all other claims
22 and issues.

23       **IT IS FURTHER ORDERED** granting La Quinta's request to strike Quinta
24 Real's "Reply to Plaintiff's Response to Defendant's Statement of Undisputed Material
25 Facts in Further Support of Defendant's Motion for Summary Judgment".  (Doc. 82).
26 Document 77 shall be stricken from the record.

27       **IT IS FURTHER ORDERED** granting Quinta Real's "Motion to Strike New
28 Evidence in Plaintiff's Reply".  (Doc. 87).  Document 79 shall be stricken from the

record.

**IT IS FURTHER ORDERED** denying La Quinta's "Request for Judicial Notice of Foreign Court Decision". (Doc. 93).

**IT IS FURTHER ORDERED** Counsel shall file a proposed Joint Pretrial Order on or before March 18, 2011.

DATED this 16th day of February, 2011.

Raner C. Collins
United States District Judge

```
                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF ARIZONA
```

| ****** ,               | )  | No. CV **-***-TUC-RCC |
|                        | )  |                       |
|    Plaintiff,          | )  | **ORDER**             |
|                        | )  |                       |
| vs.                    | )  |                       |
|                        | )  |                       |
| ****** ,               | )  |                       |
|                        | )  |                       |
|    Defendant.          | )  |                       |
|                        | )  |                       |

Pursuant to the Scheduling Order previously entered, the following is the proposed Joint Pretrial Order which shall, upon approval of the Court, become the Final Pretrial Order.

**I.    IDENTIFICATION OF PARTIES AND COUNSEL**

**II.   STATEMENT OF JURISDICTION**

Briefly state the facts and cite the statutes which give this Court jurisdiction.

**III.  NATURE OF ACTION**

Provide a concise statement of the type of case, the cause of action, and the relief sought.

**IV.   STIPULATIONS AND UNCONTESTED FACTS**

1 **V.     CONTESTED ISSUES OF FACT**
2       The following are issues of fact to be tried and determined upon trial.  Each issue of
3       fact must be stated separately and in specific terms, followed by the parties'
4       contentions as to each issue.
5           Issue:
6           Plaintiff(s) contends:
7           Defendant(s) contends:
8 **VI.    CONTESTED ISSUES OF LAW**
9       The following are issues of law to be tried and determined upon trial.  Each issue of
10      law must be stated separately and in specific terms, followed by the parties'
11      contentions as to each issue.
12          Issue:
13          Plaintiff(s) contends:
14          Defendant(s) contends:
15 **VII.   LIST OF WITNESSES**
16      Each party shall provide a list of witnesses intended to be called at trial.  Each witness
17      shall be indicated as either fact or expert.  A brief statement as to the testimony of
18      each expert witness shall also be included.
19 **VIII.  LIST OF EXHIBITS**
20      Each party shall provide a list of numbered exhibits.  A statement of either
21      UNCONTESTED or CONTESTED shall follow each listed exhibit. If contested, a
22      brief statement of the objection by the opposing party shall follow the listed exhibit.
23      (e.g. - 1. Laboratory Report from the Clinical Immunology Diagnostic Laboratory
24      dated 6/15/93.  CONTESTED by ***- Relevance, foundation and hearsay.)
25 **IX.    LIST OF DEPOSITIONS**
26      Portions of depositions that will be read at trial must be listed by page and line
27      number.  A statement of either UNCONTESTED or CONTESTED shall follow.  If
28

1 contested, a brief statement of the objection by the opposing party shall follow the
2 listed portion of the deposition to be offered.

**X. JURY TRIAL or BENCH TRIAL**

    **A.**    **For a Jury Trial**

Trial briefs (only upon request of the Court), proposed voir dire, interrogatories to the jury, stipulated jury instructions and instructions which are not agreed upon, shall be filed 10 days prior to Trial.

    **B.**    **For a Bench Trial**

Trial briefs (only upon request of the Court), shall be filed 10 days prior to Trial. Parties are referred to Local Rule 2.17 regarding the filing of proposed findings of fact and conclusions of law.

**XI.**    **PROBABLE LENGTH OF TRIAL**

**XII.**    **ADDITIONAL INFORMATION THAT MAY BE HELPFUL TO THE COURT**

**XII. CERTIFICATION**

The undersigned counsel for each of the parties in this action do hereby approve and certify the form and content of this proposed Joint Pretrial Order.

_____    _____
Attorney for Plaintiff    Attorney for Defendant

This proposed Joint Pretrial Order is hereby approved as the Final Pretrial Order on this ____ day of _____, 200*.

_____
RANER C. COLLINS
United States District Judge

- 3 -