1
2
3
4
5
6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9   La Quinta Worldwide, LLC,              )    No. CV 09-175-TUC-RCC
                                           )
10               Plaintiff,                )    **ORDER**
                                           )
11  vs.                                    )
                                           )
12                                         )
    Q.R.T.M., S.A. de C.V.,                )
13                                         )
                 Defendant.                )
14                                         )
                                           )
15  _____  )

16

17          This case involves a dispute between La Quinta Worldwide (La Quinta) and Q.R.T.M.

18  (Quinta Real) over whether Quinta Real's plans to expand its chain of resorts and spas into

19  the United States would infringe any of La Quinta's registered trademarks.   The parties

20  previously sought summary judgment as to all claims. (Docs. 65 and 67).  The Court granted

21  summary judgment to Quinta Real as to La Quinta's trademark dilution claim, but denied

22  summary judgment as to all other claims. (Docs. 101 and 124).  The Court held a bench trial

23  as to all remaining claims on March 13 and 14, 2012.  (Docs. 155 and 156).  The Court now

24  its findings of fact and conclusions of law as required by FED.R.CIV.P. 52(a)(1).

25  ///

26  ///

27  ///

28
                                       - 1 -

**FINDINGS OF FACT[1]**

1. Quinta Real hotels in Mexico are classified as luxury hotels.  In 2008 and 2009, six hotels won the AAA 4-diamond award.  However, in 2012 only four hotels won the award.

2. La Quinta properties in general are mid-tier select service hotels and motels.  However, 5% of La Quinta properties offer full service restaurants, concierge service, and room service.  In addition, La Quinta has risen steadily in the rankings amongst its nearest competitors in the last few years but is still ranked below average among other American mid-scale limited service hotels.  Guest satisfaction has risen steadily for the last three years.

3. Quinta Real has advertised extensively in the United States.  Quinta Real uses a variety of methods to advertise here, including: (1) partnering with Virtuoso, an invitation only organization dedicated to luxury travel, (2) membership in Preferred Hotels & Resorts, an association of independent hotels that provides reservation and marketing services to its members, (3) listings on on-line travel sites, including Expedia.com, Orbitz.com, and Travelocity.com, (4) American trade shows, (5) a California public relations group, (6) agreements with American companies with operations in Mexico, (7) listings in various guidebooks, and (8) unsolicited reviews in American publications.

4. Quinta Real has never opened a hotel in the United States.  However, it has as the next step in its business plan entry into the American market.  Quinta Real would consider entering any major American city.  If it did build a hotel in the United States, Quinta Real would build a hotel similar in style and quality to its properties in Mexico, although operating in the United States would be more expensive and make offering the same

---

[1]The Court will enter findings of fact only as to disputed factual issues and will not restate the undisputed facts set out in the parties' Proposed Joint Pretrial Order.  (Doc. 108).  The Court will accept those undisputed facts as stipulated to by the parties.

amenities harder.  As with its Mexican hotels, Quinta Real would strive to have the highest daily rate and rev par (revenue per available room) in its market each month.

5.   The average room rate in Mexico at a Quinta Real hotel is $183 per night.  Some rooms rent for as low as $100 per night.  La Quinta's average room rate is between $85 and $90 per night.  Room rates for La Quinta's New York City, Chicago, San Antonio, and Virginia Beach properties can be as high as $539.99, $409, $309, and $304 per night, respectively.

6.   La Quinta has more than 80 properties in major American cities: Phoenix (10), San Francisco (8), Los Angeles (1), Miami (5), Chicago (12), Las Vegas (6), New York City (14), San Antonio (18), and Austin (13).  La Quinta has nearly 800 properties in the United States, and about half of these are owned and/or operated by franchisees. (Doc. 108 at ¶¶ 7 and 11).

7.   A hotel in the United States competes with all the other hotels on its corner, regardless of rating or services offered.

8.   Hotel chains in the United States can operate as umbrella brands.  Umbrella brands offer multiple chains with different levels of service all under the same brand.

9.   Quinta Real first explored entering the American market in 1994 when it entered into a letter of intent to build a hotel in San Antonio.  The publicity surrounding the letter of intent did not indicate what the new hotel would be called.  Quinta Real thought the hotel would be called "Quinta Real" but there was no commitment to any particular name.

10.  Quinta Real next explored entering the American market in 2007 when it entered into a letter of intent to build a hotel in Tucson.  Neither the letter of intent nor the publicity surrounding it indicated what the new hotel would be called.

## CONCLUSIONS OF LAW

### I.   Subject Matter Jurisdiction

After the Court ruled on the parties' motions for summary judgment but before the bench trial, Quinta Real moved to dismiss this action for lack of subject matter jurisdiction. (Doc.

1   128).  The Court denied the motion (Doc. 134), and Quinta Real raised the issue again during

2   its opening statement and closing argument at trial.

3        Quinta Real argues the Court's stated basis for subject matter jurisdiction - its proposed

4   development of a hotel in Tucson - is insufficient because simply signing a letter of intent

5   and then abandoning the project is not "use in commerce" as required under the Lanham Act.

6        Under the Lanham Act, the Court can enter purely prospective relief and reach

7   defendants who intend or threaten to use an infringing mark.  NTN Communications, Inc. v.

8   Interactive Network, Inc., 1995 WL 569419, *2 (N.D.Cal. 1995) (citing 4 J. Thomas

9   McCarthy, McCarthy on Trademarks & Unfair Competition, § 30.05, at 30-18 to 19, and 1a

10  Jerome Gilson, Trademark Protection & Practice, § 8.07[2], at 8-156 to 157(1987)).  To fall

11  under the Lanham Act and within the Court's subject matter jurisdiction, a defendant does

12  not need to be engaged in present infringing activity.  Id.; BP Chems. Ltd. v. Union Carbide

13  Corp., 4 F.3d 975, 977 (Fed.Cir. 1993).  The Court has subject matter jurisdiction where a

14  defendant expresses an intent to use an infringing mark and takes concrete steps to do so.

15  NTN Communications, Inc., 1995 WL 569419 at *2 (subject matter jurisdiction where

16  defendant takes steps to market infringing product); BP Chems. Ltd., 4 F.3d at 978 (subject

17  matter jurisdiction where defendant is "making meaningful preparation" to make, sell or use

18  infringing product).

19       Here, Quinta Real declared its intent to use the mark at issue in the letters of intent

20  associated with the San Antonio and Tucson projects.  The letters of intent themselves

21  constitute concrete and meaningful preparation for the building of a hotel under the "Quinta

22  Real" mark in the United States.  In addition, Quinta Real also took steps to market the San

23  Antonio project using the "Quinta Real" mark when its president spoke to the press about the

24  project.  Finally, Quinta Real has declared that it still intends to enter the American market,

25  even after the failure of the Tucson project.  Quinta Real's strong declaration of its intent to

26  enter the American market along with its attempts to market the proposed hotels is sufficient

27  to sustain the Court's subject matter jurisdiction.

28

## II.  Laches

In order to prove the defense of laches in a trademark infringement case, the defendant must demonstrate that the plaintiff failed to defend against infringement of its trademark for a significant period of time such that the plaintiff is foreclosed from claiming that defendant's use is an infringement.  Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n, 465 F.3d 1102, 1108 (9th Cir. 2006).  After determining the relevant statute of limitations, the Court must then balance six factors to determine whether any delay was unreasonable.  Id.  These factors are: (1) strength and value of rights asserted, (2) diligence in enforcing mark, (3) harm to senior user if relief is denied, (4) good faith ignorance by junior user, (5) competition between the two users, and (6) extent of harm suffered by junior user.  Id.

The Court earlier declined to enter summary judgment in Quinta Real's favor as to this defense because Quinta Real failed to demonstrate La Quinta knew or should have known about the San Antonio project.  (Doc. 101 at 11-12).  Accordingly, there was a genuine issue of material fact as to whether Law Quinta acquired a cause of action as a result of the San Antonio project.  (Id.).  After trial, Quinta Real still has not demonstrated that La Quinta knew or should have known about the San Antonio project.

Even if the Court were to find that La Quinta knew or should have known about the San Antonio project and therefore acquired a cause of action at that time, Quinta Real has not demonstrated that the six Tillamook factors weigh in its favor.  First, La Quinta has a strong mark and a right to use it with respect to hotel services offered in the United States.  Second, La Quinta has diligently enforced its rights against Quinta Real by bringing this suit immediately after learning of the Tucson project, which was only Quinta Real's second attempt to enter the American market.  Third and as discussed below, La Quinta will be significantly harmed if relief is denied because there is a likelihood of confusion between the two chains if Quinta Real were to enter the American market under the "Quinta Real" mark.  Fourth, Quinta Real knew of La Quinta's presence in the American market and of its rights

1    to use its mark. Fifth and as discussed below, prior to Quinta Real's entry into the American

2    market, the two hotel chains did not compete for business in the United States. However, if

3    Quinta Real were to enter the American market, they would compete for guests. Finally, and

4    most importantly, Quinta Real has stated on the record that it did not rely in any way on La

5    Quinta's failure to challenge the San Antonio project.

6        Quinta Real bears the burden of proving the defense of laches. It has failed to prove that

7    La Quinta acquired a cause of action as a result of the San Antonio project. In addition, even

8    if La Quinta acquired a cause of action at that time, the <u>Tillamook</u> factors all weigh against

9    a finding of laches. Accordingly, the Court finds Quinta Real has not proved the defense.

10   **III. Likelihood of Confusion**

11       In order to decide La Quinta's claims of trademark infringement and unfair competition

12   as well as Quinta Real's claim for a declaration of non-infringement, the Court must decide

13   whether there is a likelihood of confusion between the La Quinta's marks and Quinta Real's

14   "Quinta Real" mark.[2] This issue is dispositive of these claims.

15       **A.  Legal Standard**

16       A likelihood of confusion is established by use of eight factors outlined in <u>AMF Inc. v.

17   Sleekcraft Boats</u>, 599 F.2d 341, 348–49 (9th Cir. 1979). Those factors are: (1) the strength

18   of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of

19   actual confusion; (5) marketing channels used; (6) the type of goods and the degree of care

20   likely to be exercised by the purchaser; (7) the likelihood of expansion of the product lines;

21   and (8) the defendant's intent in selecting the mark. <u>Id.</u>

22   ///

23

24   ────────────────

25       [2]The "Quinta Real" mark consists of the letters Q and R inside concentric ovals with
     the phrase "Quinta Real" underneath, followed by five stars, a line, and the phrase "grand
26   class hotels and resorts". The Court will not consider Quinta Real's "QR" mark, which
     consists of only the letters Q and R inside concentric ovals because La Quinta stated at trial
27   it was alleging that only the "Quinta Real" mark is likely to cause confusion.

28                                          - 6 -

**B.  Analysis**

**1.  Strength of the Mark**

The strength of a mark is assessed along a continuum (arbitrary, fanciful, suggestive, descriptive, or generic), and the stronger the mark, the wider the reach of protection from infringement.  M2 Software, Inc. v. Madacy Entm't, 421 F.3d 1073, 1080 (9th Cir. 2005); Surfvivor Media, Inc. v. Survivor Prod., 406 F.3d 625, 631-32 (9th Cir. 2005); Sleekcraft, 599 F.2d at 349.  A mark's strength can be enhanced by the owner's marketing efforts or its commercial success.  M2 Software, 421 F.3d at 1081; Sleekcraft, 599 F.2d at 350.

La Quinta's mark is strong because it is a suggestive mark with a strong advertising budget and commercial success behind it.  This finding is supported by the undisputed facts in the record.  (Doc. 108 at ¶¶ 4-7, 13-17, 26 and 36).  The "Quinta Real" mark is also strong because it is suggestive and is enhanced by its commercial success and advertising budget.  This finding is also supported by the undisputed facts in the record.  (Id. at ¶¶ 29-31, 35, 37, 47-60).  Because both marks are strong, this factor weighs in favor of La Quinta.  See Surfvivor, 406 F.3d at 632.

**2.  Proximity of the Goods**

When assessing the proximity of the goods, courts look to whether the goods are (1) complementary, (2) sold to the same class of purchasers, or (3) similar in use and function.  Sleekcraft, 599 F.2d at 349.  The inquiry focuses on whether customers are likely to associate the two product lines, Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1131 (9th Cir. 1998), or reasonably conclude that the products came from the same source.  Sleekcraft, 599 F.2d at 348 n. 10.

It is undisputed that both La Quinta and Quinta Real offer hotel services.  (Doc. 108 at ¶¶ 4, 7, and 29-30).  While it is true that La Quinta offers mid-tier select service hotels and Quinta Real offers luxury hotels (id. at ¶¶ 19 and 86-99), a reasonable customer could conclude that the two hotel chains are from the same source because some American hotels operate several different levels of hotels under one umbrella brand.  A reasonable customer,

upon encountering the "Quinta Real" mark on a hotel in the United States, could conclude that it was an expansion of the La Quinta brand.

In addition, the rates of the two hotel chains overlap significantly. La Quinta charges up to $539 per night for rooms in major cities. Quinta Real charges on average $183 per night and would only build a hotel in a major American city.

Because consumers could reasonably conclude that an American hotel with the "Quinta Real" mark was part of the La Quinta umbrella brand and the rates of the two chains overlap, this factor weighs in favor of La Quinta.

### 3. Similarity of the Marks

Mark similarity is assessed viewing each mark in its entirety as it is presented in the marketplace and comparing the marks for similarity in sight, sound, and meaning. M2 Software, 421 F.3d at 1082; Surfvivor, 406 F.3d at 633; Sleekcraft, 599 F.2d at 351. Similarities weigh more heavily than differences. Sleekcraft, 599 F.2d at 351.

When the Court looks to the only consistent portion of La Quinta's marks - the phrase "La Quinta" - and compares it with the "Quinta Real" mark, there are some similarities. Both parties treat the word "Quinta" as a separate word, and capitalize it. The meanings are also close - "country home" for "La Quinta" and "royal villa" for "Quinta Real". (Doc. 108 at ¶¶ 35-36). The main difference between the marks are the surrounding words. For the Plaintiff, "Quinta" is prefaced by the one syllable "La". For Defendant, "Quinta" is followed by the two syllable "Real". Taking sight, sound, and meaning together, the marks are similar, and this factor weighs in La Quinta's favor.

### 4. Evidence of Actual Confusion

Evidence of actual confusion is very persuasive but hard to come by. Sleekcraft, 599 F.2d at 352. Since such evidence is hard to come by, it is dispositive only when there is evidence of confusion or no evidence when the circumstances indicate that it should have been available. Id. at 353. The parties have presented no evidence of actual confusion. Quinta Real has never had a hotel in the United States, and, until recently, La Quinta did not

have hotels in Mexico.  Under these circumstances, the Court would not expect to find evidence of actual confusion in this case.  Therefore, this factor remains neutral.

### 5. Marketing Channels Used

When considering this factor, courts look to where the products are sold, the sales methods employed, the price ranges, the type and amount of publicity, and the class of purchasers exposed to the marketing efforts.  Sleekcraft, 599 F.2d at 353.

While La Quinta and Quinta Real do use varying marketing techniques, their efforts converge with third-party internet travel sites and guidebooks. (Doc. 108 at ¶¶ 15-16, 50, 55 and 57).  In addition to using the same marketing methods, the price ranges for both hotel chains overlap and third-party internet travel sites and guidebooks tend to reach the same class of purchasers.  For these reasons, this factor weighs in favor of La Quinta.

### 6. Type of Goods & Degree of Care Likely to be Exercised

The degree of consumer care is assessed using the "typical buyer exercising ordinary caution."  Sleekcraft, 599 F.2d at 353.  This standard is based on "whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." Surfvivor, 406 F.3d at 634.

At trial, La Quinta produced evidence that 70% of Quinta Real's guests are business travelers who rely on others to make their reservations.  Guests stay at Quinta Real hotels an average of 2.4 days and spend $439 per stay for their room.  Given these circumstances and the overlapping marketing channels and room rates, the reasonably prudent consumer might not take the time to distinguish between La Quinta and Quinta Real, especially given the presence of other umbrella brands in the industry.  Therefore, this factor weighs in favor of La Quinta.

### 7. Likelihood of Expansion

The likelihood of expansion factor is used to assess whether either party will expand his business to compete with the other.  Sleekcraft, 599 F.2d at 354.  Where there is a "strong possibility" that this will happen, confusion will be more likely because direct competition

1   will be more likely. E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1293 (9th Cir.
2   1992); Sleekcraft, 599 F.2d at 354.

3       La Quinta is currently expanding its inventory of properties through new construction
4   but has avowed that it has no plans to enter the luxury hotel market. Quinta Real has avowed
5   on multiple occasions that the next step in its business plan is expansion in the American
6   market. Specifically, Quinta Real wishes to build a hotel using the "Quinta Real" mark in
7   a major American city.

8       La Quinta produced evidence at trial that hotels can compete with each other regardless
9   of rate or tier because hotels compete with the other hotels on their "street corner".
10  Therefore, Quinta Real's expansion into a major American city would create direct
11  competition between the two chains, and confusion would be more likely. For these reasons,
12  this factor weighs in favor of La Quinta.

13          **8.   Quinta Real's Intent**

14      When there is evidence that the similar mark was adopted with intent to cause confusion,
15  all inferences regarding the likelihood of confusion are resolved against the alleged infringer.
16  Sally Beauty Co., Inc. v. Beautyco, Inc., 304 F.3d 964, 973 (10th Cir. 2002). While bad
17  intent can have consequences for the alleged infringer, good faith is only considered when
18  the court fashions a remedy. Sleekcraft, 599 F.2d at 354.

19      Quinta Real has not demonstrated bad faith in its attempts to enter the American market.
20  Quinta Real established its mark in Mexico for reasons personal to the founder and without
21  any reference to La Quinta. It chose to enter the American market using its mark based on
22  the good will the mark had acquired in Mexico and not because it wished to capitalize on any
23  good will associated with La Quinta's mark.

24      However, while Quinta Real has not demonstrated any bad faith, it has also admitted that
25  it would suffer no prejudice if it had to choose another name for its American hotels. This
26  lack of prejudice combined with the likelihood of confusion discussed above means that this
27  factor also weighs in La Quinta's favor.

28

- 10 -

**C.  Conclusion**

Every <u>Sleekcraft</u> factor except evidence of actual confusion weighs in favor of La Quinta.  Therefore, the Court finds there is a likelihood of confusion between La Quinta's marks and the "Quinta Real" mark if Quinta Real were to build a hotel in the United States. As noted above, this finding is dispositive of La Quinta's claims for trademark infringement and unfair competition as well as Quinta Real's claim for a declaration of non-infringement. Accordingly, the Court finds in favor of La Quinta as to these claims.

**IV. Cancellation of the QR Mark**

La Quinta asks the Court to cancel Quinta Real's registration of the "QR" mark pursuant to 15 U.S.C. § 1064 because Quinta Real has abandoned the mark.  A party seeking cancellation must demonstrate that (1) it has standing, and (2) there are valid grounds for cancelling the registration.  <u>Cunningham v. Laser Corp.</u>, 222 F.3d 943, 945 (Fed.Cir. 2000).

As to standing, § 1064 provides that

> A petition to cancel a registration of a mark...may...be filed as follows by any person who believes that he is or will be damaged, including as a result of a likelihood of dilution by blurring or dilution by tarnishment under section 1125(c) of this title, by the registration of a mark on the principal register established by this chapter...

At trial, La Quinta acknowledged that it was not alleging that the "QR" mark is likely to cause confusion with the La Quinta marks.  La Quinta did not offer any other allegations of damage at trial.  Therefore, La Quinta does not believe that it is or will be damaged by registration of the "QR" mark  and does not have standing to seek its cancellation.  <u>See Star-Kist Foods, Inc. v. P.J. Rhodes & Co.</u>, 735 F.2d 346, 348-49 (9th Cir. 1984)(petitioner must show a real and rational basis for its belief that it is or will be damaged by registration of the mark); <u>Cunningham</u>, 222 F.3d at 945 (standing requires only that petitioner believe that it is likely to be damaged by the registration).

Alternatively, La Quinta has not demonstrated that there are valid grounds to cancel Quinta Real's registration of the "QR" mark.  A mark is abandoned such that it is subject to cancellation where use is discontinued with no intent to resume.  15 U.S.C. § 1127.

1   Assuming, without deciding, that La Quinta has demonstrated non-use, it is clear from the
2   record that Quinta Real intends to use the mark.  As noted above, Quinta Real has attempted
3   to enter the American market twice already and has repeatedly avowed that the next step in
4   its business plan is to establish a hotel in the United States.  It has also repeatedly indicated
5   its preference for using its marks with any hotel built in the United States.  Accordingly, the
6   Court finds cancellation of the QR mark is not appropriate at this time.

7   **V.   Remedy**

8       Having concluded that entrance of Quinta Real into the American market under the
9   "Quinta Real" mark would constitute trademark infringement and unfair competition, the
10  Court must decide what remedy is appropriate.  La Quinta urges the Court to enter a
11  permanent injunction.

12      **A.   Permanent Injunction Standard**

13      Pursuant to 15 U.S.C. § 1116, district courts have the "the power to grant injunctions
14  according to principles of equity and upon such terms as the court may deem reasonable, to
15  prevent the violation of any right of the trademark owner."  Perfumebay.com Inc. v. eBay,
16  Inc., 506 F.3d 1165, 1177 (9th Cir. 2007).  An injunction may only be entered, however,
17  where the plaintiff demonstrates: "(1) that it has suffered an irreparable injury; (2) that
18  remedies available at law, such as monetary damages, are inadequate to compensate for that
19  injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a
20  remedy in equity is warranted; and (4) that the public interest would not be disserved by a
21  permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006).

22      **B.   Analysis**

23          **1.   Irreparable Injury**

24      As discussed above, La Quinta has proven that there would be a likelihood of confusion
25  between its marks and the "Quinta Real" mark if Quinta Real were to build a hotel in the
26  United States.  In this case, a likelihood of confusion is equivalent to irreparable injury
27  because La Quinta cannot control how Quinta Real develops and maintains any American

28                                          - 12 -

hotel.  Therefore, La Quinta could suffer injury to its good will and business reputation. Injuries to goodwill and business reputation are generally considered to be intangible and, as a result, irreparable. See Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991).

The Court notes, however, that La Quinta has demonstrated a likelihood of confusion as to the "Quinta Real" mark only.  Therefore, any permanent injunction will be limited to addressing that injury alone.

### 2.   Inadequate Remedy at Law

Intangible injuries are irreparable because quantifying their harm is impractical or impossible, and, as a result, such injuries cannot be fully remedied with a financial award. In addition to the loss of good will and injury to its business reputation, La Quinta could also suffer a loss of profits as a result of confusion with Quinta Real.  Such a loss of profits would difficult, if not impossible, to quantify.  Therefore, La Quinta has also demonstrated that it has an inadequate remedy at law for the likelihood of confusion caused by Quinta Real's use of the "Quinta Real" mark on an American hotel.

### 3.   Balance of Hardships

Quinta Real admits that it would suffer no prejudice from being forced to name an American hotel something other than "Quinta Real".  Because La Quinta would face likely harm if Quinta Real were permitted to use the "Quinta Real" mark on an American hotel, the balance of hardships tips in La Quinta's favor.

### 4.   Public Interest

The public interest would be served by the issuance of a permanent injunction because such an injunction would prevent any future guests from unintentionally staying with either party.

///

///

///

- 13 -

**C.  Scope of the Injunction**

La Quinta seeks a permanent injunction barring Quinta Real from:

> (1) using the "Quinta Real" mark to market, advertise, promote, or identify any hotel or motel services in the United States;

> (2) using the "Quinta Real" mark to market, advertise, promote, or identify any travel or hospitality-related services in the United States;

> (3) causing a likelihood of confusion or misunderstanding as to the source or sponsorship of Quinta Real's business or services by confusingly similar or identical trade indicia and dress to that used by La Quinta;

> (4) causing a likelihood of confusion or misunderstanding as to Quinta Real's affiliation, connection, or association with La Quinta or any of its services;

> (5) further prosecuting the trademark application for registration of the "Quinta Real" mark (Serial No. 78/068,836); and

> (6) further defending registration of the "QR" mark (United States Trademark Reg. No. 2,776,802) in the TTAB Cancellation Proceeding No. 92,050,085.

As noted above, La Quinta has proven only that Quinta Real's use of the "Quinta Real" mark on an American hotel would likely cause confusion because of the similarity between the names "La Quinta" and "Quinta Real".  Therefore, the Court will only enjoin Quinta Real from use of the "Quinta Real" mark and name to market, advertise, promote, or identify any hotel, motel, travel, or hospitality services located in the United States.  The Court declines to enjoin Quinta Real from any other activities.

The Court further declines to enjoin Quinta Real from prosecuting or defending its trademark registrations because this is beyond the Court's authority and unnecessary.  See 15 U.S.C. § 1119; see also Tiffany & Co. v. National Gypsum Co., 459 F.2d 527, 530 (Cust.&Pat.App. 1972)(it is possible to register trademarks whose use may be enjoined); Hammerhead Entertainment, LLC v. Ennis, 2011 WL 2938488, *11 (E.D.Va. 2011) (federal courts have no jurisdiction to cancel pending application which has not matured into a registration); Whitney Information Network, Inc. v. Gagnon, 353 F.Supp.2d 1208, 1211 (M.D.Fla. 2005) (a registered mark must exist before a court may act pursuant to § 1119);

1  GMA Accessories, Inc. v. Idea Nuova, Inc., 157 F.Supp.2d 234, 241 (S.D.N.Y. 2000) (§

2  1119 contemplates an action involving a registered trademark).

3  **VI. Conclusion**

4      The Court finds La Quinta proved at trial that there is a likelihood of confusion between

5  La Quinta's marks and the "Quinta Real" mark if Quinta Real were to build a hotel in the

6  United States.  Accordingly, the Court finds for La Quinta as to its trademark infringement

7  and unfair competition claims and as to Quinta Real's counterclaim for a declaration of non-

8  infringement.  The Court finds for Quinta Real as to La Quinta's claim for cancellation of

9  the QR marks.  In a separate order, the Court will enter a permanent injunction enjoining

10 Quinta Real from using the "Quinta Real" mark and name for services in the United states

11 related to hotels, motels, travel, or hospitality only.  Accordingly,

12     **IT IS ORDERED** the Court finds in favor of La Quinta as to Counts One, Two, and

13 Four contained in the Complaint.  (Doc. 1).  The Court finds in favor of Quinta Real as to

14 Count V contained in the Complaint.  (Id.).  The Court finds in favor of La Quinta as to

15 Count One contained in Quinta Real's Answer and Counterclaim.  (Doc. 18).

16     **IT IS FURTHER ORDERED** granting La Quinta injunctive relief as requested in

17 Count Six in the Complaint.  (Doc. 1).  A separate order will issue setting out the extent of

18 the relief granted.

19     **IT IS FURTHER ORDERED** there being no issues remaining in this action, it is

20 dismissed with prejudice.  The Clerk of Court shall enter judgment accordingly.

21     DATED this 29th day of March, 2012.

22

23

24     _____

25             Raner C. Collins
           United States District Judge

26

27

28